# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| JAIMIE SHAPIRO | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| *v.* | ) |
| | ) |
| KATTEN MUCHIN ROSENMAN LLP, | ) |
| *et al.* | ) |
| | ) |
| Defendants. | ) |

C.A. No. 1:17-cv-01759 (EGS)

---

## AMENDED COMPLAINT

JAIMIE SHAPIRO ("Ms. Shapiro"), by counsel, hereby moves this Court for Judgment, against the Defendants, KATTEN MUCHIN ROSENMAN LLP ("Katten Muchin"), S. SCOTT MORRISON ("Mr. Morrison"), DANIEL C. SPURLOCK ("Mr. Spurlock"), RONALD D. PAUL ("Mr. Paul"), ZACH WADE ("Mr. Wade"), AND MAKEOFFICES, LLC ("MakeOffices")  jointly and severally, and in support thereof, states as follows:

1.     This is a civil action alleging unlawful termination, retaliation, and discrimination based on gender, pregnancy, and disability and aiding and abetting thereof under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-401.01, *et seq.*, D.C. Code § 2-1402.01, *et seq.*, and D.C. Code § 2-2402.11, *et seq.*

2.     This action also states claims for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, invasion of privacy, breach of contract, conspiracy, defamation, tortious interference with contractual or business expectancy, and intentional infliction of emotional distress.

## SUMMARY OF CONDUCT GIVING RISE TO THIS COMPLAINT

3.      Ms. Shapiro is the former General Counsel and Chief of Staff of MakeOffices, a Virginia company that leases office space for the purpose of subleasing portions of the space to companies and individuals on a temporary basis.  Ms. Shapiro is 31 years old, was pregnant from for much of 2017 until the birth of her child in September 2017, and underwent a double mastectomy in May of 2016.  Despite being told on numerous occasions by her employer MakeOffices that she had performed exemplary work and had no performance issues, Ms. Shapiro was suddenly and without warning terminated "for cause" on June 19, 2017.   At the time of the termination, Ms. Shapiro was handed an unsigned letter by Zach Wade, the current CEO of MakeOffices, which included an attachment purporting to form the basis for the "for cause" termination.  The attachment made no mention of Ms. Shapiro's performance at MakeOffices while Mr. Wade had been the CEO (since April 10, 2017), contained false and defamatory statements about Ms. Shapiro, and was prepared by Katten Muchin, S. Scott Morrison and Daniel Spurlock, attorneys who represented Ronald  Paul and Zach Wade in other entities, but who did not represent MakeOffices.  Katten Muchin, S. Scott Morrison and Daniel Spurlock created the false and defamatory document attached to the termination letter in conjunction with Zach Wade, Ronald Paul and MakeOffices in order to discriminate and retaliate against Ms. Shapiro because of her health issues and pregnancy, and to punish Ms. Shapiro because she would not engage in unethical and illegal conduct.

4.      Zach Wade published the defamatory termination letter and attachment to multiple individuals, despite admitting to Ms. Shapiro and others that he did not agree with its content, and further admitted that the termination of Jaimie Shapiro was discussed at a meeting which included Ronald Paul, Zach Wade, S. Scott Morrison, Daniel Spurlock and other attorneys

at Katten Muchin on June 17, 2017 in which Katten Muchin, S. Scott Morrison, Daniel Spurlock and Ronald Paul directed Zach Wade to terminate Ms. Shapiro and use the defamatory letter and attachment as the supposed legitimate business justification to cover up their true motivations for terminating Ms. Shapiro, which were based on discriminatory and retaliatory animus, and because Ms. Shapiro refused to engage in illegal and unethical conduct.

5.      The Defendants have also engaged in the harassment of Ms. Shapiro since 2016, first filing a lawsuit against MakeOffices naming Ms. Shapiro as a nominal Defendant (the "First Fairfax Action") and, after a nonsuit of that case, naming Ms. Shapiro in her individual capacity in a second derivative action against MakeOffices and numerous related individuals (the "Second Fairfax Action").

6.      Defendants' retaliation of Ms. Shapiro escalated significantly following the filing of this DC Action on August 2, 2017.

7.      First, on August 18, 2017, Defendants filed a retaliatory lawsuit in Fairfax County Circuit Court against Ms. Shapiro, her counsel, Mr. Rahbar and his counsel, and the IT forensic consultants retained by Mr. Rahbar's counsel in connection with the original Fairfax litigation. This litigation has since been removed to the United States District Court for the Eastern District of Virginia (the "EDVA Action").

8.      The Defendants filed the EDVA Action immediately after Ms. Shapiro filed the DC Action, and had complained of inequitable treatment during and following her employment with MakeOffices both individually and through her counsel.  The DC Action specifically alleges that Defendants discriminated against and retaliated against Ms. Shapiro during the course of her employment and through her termination.  Ms. Shapiro had also specifically

3

complained that she was being unfairly targeted and harassed by the Defendants in litigation due to her gender and pregnancy, and not based on any actual wrongdoing.

9.      In response, the Complaint in the EDVA Action regurgitates the baseless allegations from the Fairfax litigation, attempt to implicate Ms. Shapiro in misconduct that she was not involved in, make defamatory claims about Ms. Shapiro that damage her professional and personal reputation, and which continues the pattern of harassment, discrimination, and retaliation against Ms. Shapiro by the Defendants.

10.     The EDVA Action further names Ms. Shapiro's counsel, again without factual basis, in order to retaliate against Ms. Shapiro for complaining of mistreatment due to her gender and refusal to engage in unethical conduct.

11.     Second, Defendants filed a motion in the Second Fairfax Litigation seeking to disqualify and sanction Ms. Shapiro and her counsel which Defendants *admitted in writing* was filed in response to Ms. Shapiro's filing of this lawsuit.

12.     And finally, Defendants filed an Amended Complaint in the Second Fairfax Action on October 23, 2017, which makes false allegations regarding actions taken while Ms. Shapiro was General Counsel of MakeOffices.  In particular, the Second Amended Complaint continues to reiterate the falsehoods that Ms. Shapiro committed fraud, conspired, embezzled, converted, or otherwise betrayed her fiduciary duties to MakeOffices and ethical duties as an attorney despite providing no factual support for such allegations, and was filed immediately after Ms. Shapiro filed this DC Action.

13.     The Second Amended Complaint in the Second Fairfax Action also attempts to implicate Ms. Shapiro in actions that allegedly involved only Mr. Rahbar, and Defendants have been unable to provide any further factual detail as to any wrongdoing on Ms. Shapiro's part despite three attempts in three separate Complaints.

14.     In addition to their abusive litigation tactics, Defendants Katten Muchin, Morrison, and Spurlock have also engaged in an effort to attempt to cover up the discriminatory and retaliatory termination of Ms. Shapiro by trying to find some post-hoc, legitimate basis for terminating Ms. Shapiro.  As a part of this scheme, S. Scott Morrison, Daniel Spurlock and Katten Muchin engaged in illegal and unethical searches of Ms. Shapiro's emails at MakeOffices which knowingly included sexually explicit terms that would be disclosed to Ms. Shapiro, MakeOffices employees, and others in discovery, and searches of attorney-client privileged communications with MakeOffices' outside counsel.  These harassing, discriminatory, and retaliatory searches reflect the animosity, malice, ill-will and spite S. Scott Morrison, Daniel Spurlock and Katten Muchin harbor against Ms. Shapiro.

15.     In their personal animosity and rage directed at Ms. Shapiro, S. Scott Morrison, Daniel Spurlock and Katten Muchin have engaged in a course of conduct which has included defamation and intentional infliction of emotional distress, departing significantly from any attorney-client or work product privilege (which has been waived in any event), and have targeted Ms. Shapiro viciously because of her double mastectomy, pregnancy and gender, causing extreme emotional distress to Ms. Shapiro.   In this process, they have conspired with MakeOffices, Zach Wade and Ronald Paul to torment and terminate Ms. Shapiro while she was experiencing a difficult pregnancy, even though Ms. Shapiro's job performance continued to be exemplary.

## PARTIES

16.     Plaintiff Jaimie Shapiro is a resident and citizen of Fairfax, Virginia. Ms. Shapiro is a former employee of MakeOffices, LLC.

17.     Defendant Katten Muchin Rosenman LLP is a limited liability partnership and law firm organized and located in the District of Columbia, with more than 600 attorneys in locations across the United States, London, and Shanghai.

18.     Katten Muchin, along with and through Mr. Morrison and Mr. Spurlock, serve as counsel for two entities with ownership interests in MakeOffices, but at all times material, did not serve as counsel to MakeOffices.

19.     Defendant S. Scott Morrison is an individual and Partner at Katten Muchin's Washington, D.C. office located at 2900 K St. N.W., North Tower-Suite 200, Washington, D.C. 20007.

20.     At all times relevant hereto, Mr. Morrison was, and is, a Partner of Katten Muchin and counsel for MRP UO Partners, LLC and Harris UO Investors, LLC.

21.     Defendant Daniel C. Spurlock is an individual and Partner at Katten Muchin's Washington, D.C. office located at 2900 K St. N.W., North Tower-Suite 200, Washington, D.C. 20007.

22.     At all times relevant hereto, Mr. Spurlock was, and is, a Partner of Katten Muchin and counsel for MRP UO Partners, LLC and Harris UO Investors, LLC.

23.     Defendant Ronald D. Paul is an individual who conducts substantial business within the District of Columbia, including but not limited to his capacity as a Member and Board Member of MakeOffices; he is the Chief Executive Officer of EagleBank and co-founder of Harris UO Investors, LLC.

24.     Defendant Zach Wade is an individual who conducts substantial business within the District of Columbia; he is the Chief Executive Officer and member of the Board of Directors of MakeOffices, LLC, and is a Principal with MRP Realty, and a Director of MRP UO Partners, LLC.

25.     Defendant MakeOffices is a limited liability company which has a principal place of business in and conducts substantial business in the District of Columbia.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this complaint pursuant to D.C. Code Ann. § 11-921 and over the statutory claims pursuant to D.C. Code Ann. § 2–1403.16.

27.     Katten Muchin is organized under the laws of the District of Columbia and is located in the District of Columbia.  Katten Muchin is counsel to UO Harris, LLC and MRP UO Partners, LLC and has provided advice and counsel out of its offices in the District of Columbia.

28.     Mr. Morrison was, and is, a Partner at Katten Muchin in the District of Columbia during the times relevant hereto, and has provided legal advice and counsel out of its offices in the District of Columbia.

29.     Mr. Spurlock was, and is, a Partner at Katten Muchin in the District of Columbia during the times relevant hereto, and has provided legal advice and counsel out of its offices in the District of Columbia.

30.     Mr. Paul is an individual that conducts substantial business in the District of Columbia.

31.     Mr. Wade is an individual that conducts substantial business in the District of Columbia and servesas CEO of MakeOffices out of its office in the District of Columbia.

32.     MakeOffices has its principal place of business located in the District of Columbia and conducts substantial business in the District of Columbia.

33.     Ms. Shapiro conducted the majority of her executive duties at the MakeOffices offices in the District of Columbia, and was assigned to the District of Columbia headquarters. Ms. Shapiro was terminated in the MakeOffices office located in the District of Columbia, which was MakeOffices' principal place of business at the time.

34.     The Court has personal jurisdiction over Defendants pursuant to D.C. Code Ann. §§ 13-334, 13-422, and 13-423, because the allegations and claims for relief herein arise from Defendants' "transaction of business" and "doing business" in the District of Columbia and the Defendants are domiciled in or maintain their principal places of business in, the District of Columbia.

35.     Venue is proper in this Court because Defendant's principal place of business is located within the District of Columbia and because a significant part of the events giving rise to Ms. Shapiro's complaint occurred within the District of Columbia, including her termination.

## BACKGROUND

### MakeOffices Shareholder Disputes

36.     Plaintiff Ms. Shapiro was the General Counsel and Chief of Staff of MakeOffices, a co-working and shared office space company, with locations throughout the Washington, D.C. metropolitan area, Chicago and Philadelphia.  MakeOffices charges members a monthly fee for its space, ranging from a mailing address and access to networking, up to a private workstation and a plethora of business amenities.

37.     MakeOffices was founded in 2011 as Uber Offices, LLC, and officially changed its name to MakeOffices, LLC in February 2016.

38.     Ms. Shapiro was hired by MakeOffices in August 2013 by MakeOffices' founder and then-CEO, Raymond Rahbar.  Ms. Shapiro, Mr. Rahbar, Brian Bharwani, Robin Paul Nelson, Shana Glenzer, Reid Fetters, and Ryan McCauley all served as Officers of MakeOffices.

39.     MakeOffices consists of five members:  IZ Best Bros, LLC; Current Yield with Participation Fund I, LLC; Best Inbestuhment, LLC; MRP UO Partners, LLC ("MRP UO"); and Harris UO Investors ("Harris UO").  Mr. Rahbar owns approximately 62% of MakeOffices through the entity he controls, IZ Best Bros, LLC; through this entity he is the majority shareholder of MakeOffices.

40.     Mr. Wade is the Director of MRP UO, and Mr. Paul is the Director of Harris UO. Mr. Paul is also the Chairman of EagleBank, Inc. ("EagleBank").

41.     Mr. Paul exerts vast influence over MakeOffices, and through his influence EagleBank has provided millions of dollars in financing for MakeOffices.

42.     Mr. Paul also exerts further influence through his control of one of the minority members of MakeOffices, Harris UO.

43.     Starting in 2016, MRP UO and Harris UO sought to remove Mr. Rahbar as CEO. MRP UO and Harris UO first brought suit against Mr. Rahbar in August 2016, in the case of *MRP UO Partners, LLC, et al. v. Raymond Rahbar, et al.*, CL 2016-11747, in the Circuit Court of Fairfax County ("First Fairfax Action").  Ms. Shapiro was named as a nominal defendant in the First Fairfax Action.  The First Fairfax Action was nonsuited following substantial discovery being taken and on the eve of a scheduled hearing on dispositive motions.

44.     On January 18, 2017, MRP UO and Harris UO re-filed a new action against Mr. Rahbar, MakeOffices, and thirteen other corporate and individual defendants, including Ms. Shapiro in her individual capacity, in the action *MRP UO Partners, LLC, et al. v. MakeOffices,*

9

*LLC, et al.*, CL 2017-00817, before the Circuit Court of Fairfax County (the "Second Fairfax

Action"). MRP UO and Harris UO are represented by Katten Muchin, Mr. Morrison, and Mr.

Spurlock.

45.     An Amended Complaint was filed in the Second Action on April 7, 2017.

46.     Mr. Wade, Mr. Paul, and Chris Juni*or* signed a Consent as Directors of

MakeOffices on April 8, 2017 naming Mr. Wade CEO of the company.

47.     Mr. Wade was installed as CEO of MakeOffices by Court Order on April 10,

2017.

48.     A Consent Order of Stay was entered into in the Second Action on April 24,

2017.

49.     Notwithstanding the allegations of the Second Action and Mr. Wade's installment

as CEO, Ms. Shapiro was retained in her positions of MakeOffices' General Counsel and Chief

of Staff after Mr. Wade took over as CEO.

50.     Specifically, Mr. Wade and Mr. Paul met with Ms. Shapiro in mid-April 2017. In

this meeting, Mr. Wade and Mr. Paul told Ms. Shapiro that she was an extremely valued and

highly respected employee of MakeOffices, that they did not believe she had done anything

wrong in her actions at MakeOffices, that they had read everything their attorneys at Katten

Muchin had provided in connection with the First and Second Fairfax Actions, that they

remained of the belief that Ms. Shapiro had done nothing wrong. Mr. Paul and Mr. Wade further

stated that they were going to instruct their attorneys to dismiss Ms. Shapiro from the Second

Fairfax Action, as they believed it would be in MakeOffices' best interest if Ms. Shapiro

remained in her role as General Counsel and Chief of Staff.

51.    When Mr. Paul and Mr. Wade so instructed their attorneys, Katten Muchin, Mr. Morrison and Mr. Spurlock, they refused to dismiss Ms. Shapiro, stating that Ms. Shapiro was needed as leverage for them to obtain a more favorable result against Mr. Rahbar.  Katten Muchin, Mr. Morrison, and Mr. Spurlock sought to continue harassing Ms. Shapiro through the Second Fairfax Action in order to aggravate her difficult pregnancy, which they believed would lead to a settlement due to Mr. Rahbar's personal sympathy for Ms. Shapiro due to her health history (involving a double mastectomy in 2016) and complicated pregnancy in 2017.

52.    When Mr. Wade pressed Katten Muchin, Mr. Morrison and Mr. Spurlock to dismiss Ms. Shapiro from litigation, given Ms. Shapiro's continuing employment with MakeOffices and the difficulty in reconciling Ms. Shapiro's alleged misconduct while continuing her in a trusted role, Mr. Morrison became enraged and "yelled" at Mr. Wade.

53.    Katten Muchin, Mr. Morrison, and Mr. Spurlock intentionally retained Ms. Shapiro as a defendant solely due to her gender, and not due to any legitimate belief that Ms. Shapiro had engaged in any wrongdoing.

54.    Mr. Wade and Mr. Paul subsequently disclosed these conversations regarding dismissing Ms. Shapiro from litigation to third parties, thereby waiving any attorney-client privilege attaching to these communications.

55.    Katten Muchin, Mr. Morrison and Mr. Spurlock, enraged and personally and professionally compromised by their clients believing and requesting that Ms. Shapiro be dismissed from the Second Fairfax Action while they refused, and in an attempt to hide their true motivations to target Ms. Shapiro because of her health and pregnancy, set out on a vicious, malicious course of action to discriminate and retaliate against Ms. Shapiro in her employment

with MakeOffices, defame and inflict emotional distress on Ms. Shapiro, invade her privacy and procure her termination.

56.    Ms. Shapiro repeatedly questioned her treatment by Katten Muchin, Mr. Morrison, and Mr. Spurlock, both individually and through her counsel, and consistently stated to them that she had committed no illegal acts, and was being targeted and discriminated against on the basis of her gender, her health status and her pregnancy.

57.    Throughout 2017, Defendants engaged in increasingly harassing conduct which ultimately included Ms. Shapiro's termination, the filing of an additional retaliatory lawsuit, and a retaliatory and groundless motion to sanction and disqualify Ms. Shapiro and her counsel.

**Illegal Searches of Ms. Shapiro's E-mails**

58.    First, in a desperate attempt to find any information to use against Ms. Shapiro to cover up the discriminatory and retaliatory treatment and termination of Ms. Shapiro, Katten Muchin, Mr. Spurlock, and Mr. Morrison illegally and unethically raided Ms. Shapiro's email account with MakeOffices.

59.    In early June 2017 and continuing to the present, Katten Muchin, Mr. Morrison and Mr. Spurlock accessed the emails of Ms. Shapiro at MakeOffices with the intent to harass, demean, and inflict emotional distress upon Ms. Shapiro.

60.    The searches the Katten Muchin, Mr. Morrison and Mr. Spurlock ran included words "F**k," "c**t," "sex," "sexy,"[1] and a variety of other grotesque, outrageous, sexually-explicit, and gender-based search terms.

---

[1]Actual words were used, but asterisks have been inserted for this Complaint.

61.     The search terms used by Katten Muchin, Mr. Morrison, and Mr. Spurlock were intended to find information which would cause emotional distress to Ms. Shapiro, and which Katten Muchin, Mr. Morrison, and Mr. Spurlock knew would cause Ms. Shapiro distress upon her discovery of the terms.

62.     Katten Munchin, Mr. Morrison, and Mr. Spurlock also intended for these search terms to become known to MakeOffices employees and others in the course of litigation, and intended for these terms to demean, embarrass, and intimidate Ms. Shapiro on the basis of her gender and in retaliation for Ms. Shapiro's complaints about her treatment due to her gender and pregnancy.

63.     In conjunction with these sexually harassing email searches, Katten Munchin, Mr. Morrison, and Mr. Spurlock also sought highly sensitive attorney-client protected communications, such as MakeOffices' privileged emails with its outside counsel.

64.     Between June 27, 2017 and July 1, 2017; Katten Muchin ran the following searches of Ms. Shapiro's email account: "Undertaking," "Indemnified," "Attorneys Fees," "Ginsburg," "Dimuro," "Bredehoft," "Invoice," "Ethical Duties," "Aid and Direction," "Clark Hill," "Bankroft," "Thorson," "JP Law / Sherry," "Legal@makeoffices.com," "attorney invoice," "Sage Johnson," and "Freeman."

65.     Katten Muchin, Mr. Morrison and Mr. Spurlock conducted the unlawful searches without Ms. Shapiro's consent and were deliberately searching for privileged and private communications.

66.     Katten Muchin, Mr. Morrison and Mr. Spurlock conducted the unlawful searches without the knowledge, consent or authority of Ms. Shapiro.

67.     Katten Muchin, Mr. Morrison and Mr. Spurlock had no legally recognized authority, express, implied, or otherwise, to conduct the searches or review MakeOffices and Ms. Shapiro's private and, in some cases, privileged emails, and these searches and review were illegal.

68.     Katten Muchin, Mr. Morrison and Mr. Spurlock's targeting of Ms. Shapiro in these searches and review of her emails constituted discrimination and retaliation against Ms. Shapiro because of her health issues and pregnancy, because of her gender, and her complaints of discrimination, because she refused to engage in illegal and unethical acts, and in an attempt to cover up the intentional discrimination and retaliation, to defame and interfere with Ms. Shapiro's employment, and reflected their rage, malice, and animosity towards Ms. Shapiro.

**Ms. Shapiro's Medical Issues**

69.     In mid-2016, Ms. Shapiro underwent a double mastectomy for which she took medical leave.

70.     Ms. Shapiro was pregnant throughout the first part of 2017, and gave birth to her first child in September 2017.

71.     Ms. Shapiro's pregnancy was complicated and she has been diagnosed with hyperemesis gravidarum, a condition characterized by severe nausea, vomiting, weight loss, and electrolyte disturbance.

72.     Defendants have been aware of Ms. Shapiro's pregnancy complications, both through information that she has shared with MakeOffices and through communications from Ms. Shapiro's counsel.

73.     In response, Defendants have discriminated against Ms. Shapiro due to her pregnancy and retaliated against her for her later complaints that she was being unfairly targeted in litigation due to her pregnancy, as detailed below.

**Ms. Shapiro's Refusal to Engage in Unethical and Illegal Conduct**

74.     In the May-June time period in 2017, Katten Muchin, Mr. Morrison, Mr. Spurlock, Mr. Paul, Mr. Wade and MakeOffices conspired to prepare an illegal settlement agreement that would terminate Ms. Shapiro, require her to engage in illegal conduct and participate in and permit unethical conduct, release all Defendants (including the attorneys, Katten Muchin, Mr. Morrison and Mr. Spurlock against whom Ms. Shapiro had asserted claims separate from their clients, yet they insisted on including themselves in the release with their clients) from liability for their illegal conduct.

75.     The illegal and unethical demand to sign the "agreement" was made on Saturday, June 17, 2017, with a deadline to accept by 3:00 p.m. Sunday, June 18, 2017.

76.     Ms. Shapiro communicated that the demand to sign the agreement was illegal and unethical and further stating that she was refusing to sign the "agreement" because it included a demand for her to engage in illegal conduct and participate in, be aware of, and permit unethical conduct.

77.     Ms. Shapiro is a licensed attorney in Virginia, her acceptance of this unethical demand would place herself in violation of the Virginia Rules of Professional Conduct.

78.     Because Ms. Shapiro refused to accept the illegal and unethical demand, Defendants retaliated against Ms. Shapiro by terminating her employment, and filing the retaliatory litigation and actions as follows.

15

**Retaliatory Termination of Ms. Shapiro**

79.    On Friday, June 16, 2017, Ms. Shapiro sent Mr. Wade an email regarding a project she was working on at MakeOffices.

80.    That same day, Mr. Wade sent an email in response to Ms. Shapiro stating: "thanks Jaimie, these are great insights.  Very Helpful.  Take a look at my revisions responding to your notes and let me know your thoughts."

81.    Mr. Wade's email response to Ms. Shapiro on Friday June 16, 2017 implied he had no intention of terminating Ms. Shapiro.

82.    After Ms. Shapiro communicated on June 18, 2017 that she would not engage in illegal or unethical conduct being demanded by Defendants, later that same day, Mr. Wade requested that Ms. Shapiro meet him privately at MakeOffices' Washington, D.C. headquarters, located at 1015 15th Street, N.W. #600, Washington, D.C. 20005.

83.    Ms. Shapiro met with Mr. Wade as requested on Monday, June 19, 2017.

84.    Upon arriving at the office, Ms. Shapiro was ushered into a conference room with Mr. Wade and Erika Camacho ("Ms. Camacho"), the Director of Human Resources at MRP Realty.

85.    Ms. Camacho was not an employee of MakeOffices, did not speak for MakeOffices, and had no authority to take any action on behalf of MakeOffices.

86.    Ms. Camacho communicated the purpose of the meeting was to discuss the termination of Ms. Shapiro's employment with MakeOffices and that she was being terminated for cause.

87.    When Ms. Shapiro asked the reason for cause, Ms. Camacho stated that everything was explained in a folder that she handed to Ms. Shapiro, indicating that she had read the contents, even though she was not an employee of MakeOffices.

88.    The folder included an unsigned termination letter, with an attachment, also unsigned.

89.    The termination letter attachment included the words "Defendants" and "Plaintiffs" throughout the text.

90.    There are no "Defendants" or "Plaintiffs" at MakeOffices.

91.    The termination letter and attachment were prepared by Katten Muchin, Mr. Morrison and Mr. Spurlock, in conspiracy with Mr. Paul and Mr. Wade to create false reasons for terminating Ms. Shapiro "for cause," for the purpose of covering up their discriminatory and retaliatory motivations for illegally terminating Ms. Shapiro.

92.    Prior to and in the termination letter attachment being prepared and communicated to Mr. Paul and Mr. Wade, Katten Muchin, Mr. Morrison and Mr. Spurlock communicated some of these false and defamatory statements to Mr. Paul and Mr. Wade to try to turn Mr. Paul and Mr. Wade against Ms. Shapiro, in light of Mr. Paul and Mr. Wade's expressed support for Ms. Shapiro and her continuing employment with MakeOffices.

93.    The termination letter attachment contain the following defamatory statements:

a)    "Jaimie Shapiro is complicit in this scheme [of Misappropriating Lease Commissions and creating a Contingent Agreement for Mr. Rahbar] . . . Ms. Shapiro . . . attempted to conceal the thefts . . . In violation of her fiduciary duties to MakeOffices as its General Counsel, Ms. Shapiro has never once demanded the return of the stolen funds to the Company, reported the theft to the other Board members, or taken any action with respect to law enforcement authorities. Indeed, Ms. Shapiro has never done anything to remedy these thefts or any of the other wrongdoing by Rahbar"

b) "Rahbar turned to Ms. Shapiro for help, and together they methodically planned to entrench themselves in power, eliminate Plaintiffs' authority, and embezzle remaining Company funds through the Company's subsidiaries . . . The amendments prepared by Ms. Shapiro were specifically designed to provide the legal framework and authorization for certain exorbitant cash payments and in-kind benefits that Rahbar had granted to himself just weeks prior -without the Board's knowledge or approval . . . As General Counsel, Shapiro was familiar with the terms of the Operating Agreement and of Plaintiffs' authority to set Rahbar's salary. Nevertheless, she actively assisted Rahbar to secretly amend the subsidiary operating agreements so as to circumvent MakeOffices's Operating Agreement and the Board. The purpose of her actions was to provide cover for Rahbar to take from the Company hundreds of thousands of dollars in unauthorized salary and other valuable benefits without the Board's knowledge."

c) "Defendants [Mr. Rahbar and Ms. Shapiro] falsified official bank documents and Company records to inflate the build-out costs of the Company's locations by at least hundreds of thousands of dollars. They did so in order to defraud the Company's landlords into paying excessive reimbursements for the buildouts in order to capture those funds for their personal use . . ."

d) "Ms. Shapiro played an essential role in facilitating this fraudulent scheme against the Company's landlords. It was she who formed and organized the shell entity Raezer Construction, LLC so that it could pose as MakeOffices's general contractor and inflate invoices for supplies and for work actually being done by others."

e) "Ms. Shapiro, along with Rahbar and the Company's other officers, violated Va. Code § 13.1-1028 and the Company Operating Agreement by (1) failing to maintain complete and accurate books and records of the Company's financial and business affairs; (2) failing to create and maintain a financial repository cloud for all financial records of the Company that is accessible to all members at any time and without notice; (3) denying Plaintiffs' access to those records despite repeated reasonable demands; and (4) routinely failing to deliver the necessary financial reporting to the Board and the Members."

f) "Ms. Shapiro, along with Rahbar, spearheaded an expansive cover-up and resistance campaign to prevent Plaintiffs from uncovering their misconduct and holding them and the other Defendants accountable. While this campaign ultimately failed, it allowed Rahbar to illegally maintain control of MakeOffices for many months and devastated the Company financially . . . Specifically, both Rahbar and Ms. Shapiro refused to respond to Plaintiffs' requests initially. After several follow-up requests for confirmation that the Written Consent and Audit Review Notice would be complied with, Mr. Bharwani forwarded an e-mail statement from Ms. Shapiro in which she refused to recognize the validity of the Written Consent"

g) "Ms. Shapiro also participated in an illegal effort to keep Rahbar in power despite the Written Action of the Board of Directors removing him."

h) "Ms. Shapiro and Mr. Raezer are the same two people who colluded with Rahbar to misappropriate more than $615,000 in lease commission payments from the Company."

i) "Defendants Shapiro, Raezer, and Rahbar had been conspiring in secret for months to violate the Operating Agreement and seize control of the Board."

j) "Ms. Shapiro's conduct blatantly violated her fiduciary duties to MakeOffices and her duty to not favor one member of the Company over others. Her misconduct and her purported Board appointment also created an inherent conflict of interest for her as the Company's attorney."

k) "[Ms. Shapiro] admitted to drafting severance agreements in violation of her fiduciary duties to the Company."

l) "Ms. Shapiro called for Clark Hill's termination in order to install a different law firm as the Company's counsel that she and Rahbar could control and that would treat their personal interests as if they were the same as the Company's interests."

m) "Ms. Shapiro's actions, and her refusal to step down as General Counsel, left the Company deadlocked and paralyzed for many months and caused it millions of dollars in financial and reputational harm."

n) "Ms. Shapiro was not merely reacting to Plaintiffs, nor was she surprised at their removal of Rahbar. Rather, she had methodically and broadly planned in advance with Rahbar to entrench themselves in power and to eliminate Plaintiffs' authority, because they expected to be targeted for removal once their schemes were uncovered."

o) "Ms. Shapiro also led an improper and unethical effort to put into place invalid severance agreements for herself and her co-Defendants. The purpose of these agreements was to enrich the Defendants in the event their schemes were discovered by Plaintiffs and they were terminated as a result."

p) "Ms. Shapiro instructed the Company's outside counsel to lie and falsely claim to have written the illicit documents so that she would not get into trouble if they were discovered . . . Ms. Shapiro also took concerted steps to cover her tracks by sending the draft agreements from her personal e-mail account, rather than her Company e-mail account."

q) "When Plaintiffs did discover Defendants' misconduct and began acting to protect MakeOffices, Ms. Shapiro joined Rahbar in carrying out a multi-faceted campaign of retaliation against Plaintiffs. Like the cover-up campaign, the retaliation campaign was a desperate effort by Ms. Shapiro to avoid culpability for herself, Rahbar, and their co-conspirators."

r) "Ms. Shapiro's retaliatory acts in furtherance of the Defendants' conspiracy have included at least the following: On July 27, 2016, Shapiro wrote letters to all of the Company's landlords . . . Shapiro's statements to Company landlords carried significant implications for MRP UO's reputation and standing in the real estate industry . . . she was again acting to protect Rahbar and assist him in maintaining management control of the Company to hide their misconduct and misappropriation. Ms. Shapiro knew these statements were demonstrably false, yet she made them anyway to dissuade the landlords from communicating with MRP UO and to inhibit its ability to properly conduct and oversee the operations of MakeOffices's business."

s)  "Shapiro conspired with Rahbar and the other Defendants to cut Plaintiffs off from MakeOffices's business and squeeze MRP UO out of the Company. They attempted to divest Plaintiffs of their majority vote on the Board by conspiring to secretly appoint herself and Defendant Raezer to the Board of Directors. They also denied MRP UO access to Company books and records and withheld tax information that it needed to comply with its tax obligations. Defendants, including Ms. Shapiro specifically, also frivolously challenged MRP UO's membership in the Company based upon a concocted theory that MRP UO supposedly failed to satisfy its capital contribution obligation . . .Ms. Shapiro . . . intended . . . to punish MRP UO for investigating her role."

t)  "Defendant Rahbar, with Ms. Shapiro's knowledge and input, knowingly violated material obligations set forth in the Facility Agreement by creating bank accounts for MakeOffices and its subsidiaries at other financial institutions, including BB&T and Bank of America. They also diverted funds that should have been deposited into MakeOffices's bank accounts at EagleBank into accounts at other banks that are owned or controlled by Rahbar and/or Raezer."

u)  "Rahbar's actions, which were done with Ms. Shapiro's knowledge and complicity, knowingly placed the Company in technical default of its loan obligations with EagleBank, putting its very existence at risk."

v)  "Defendants sought to deter Plaintiffs' investigation, and they wanted to first move the Company's funds out of the hands of EagleBank. Ms. Shapiro . . . has pretended that Rahbar's actions were appropriate and helped him to conceal them by blocking Plaintiffs' efforts to access the Company's books and records."

w)  "In rank retaliation towards Ron Paul, Rahbar and Ms. Shapiro callously fired his daughter without warning and despite her stellar performance as an employee. Plaintiffs know that Ms. Shapiro was involved in - and perhaps was responsible for - the decision to fire Ms. Nelson for retaliatory purposes, because they obtained e-mails in which Ms. Shapiro directs Rahbar to speak to her about Ms. Nelson."

x)  "Ms. Shapiro sent these e-mails during the run-up to Ms. Nelson's firing and during the period when Defendants were covertly surveilling her electronically. Plaintiffs also know that Ms. Nelson's firing was retaliatory, because Rahbar told her it was.  Ms. Nelson sated in an e-mail shortly after her firing."

y)  Ms. Shapiro "never reported th[e] illegal motive [for firing Ms. Nelson] to the Board or outside authorities, or otherwise tried to do anything at all to help Ms. Nelson. And, conveniently, Ms. Shapiro never attempted even to offer Ms. Nelson the kind of exorbitant severance package that she created for herself."

94.    Each of the above statements were false and intentionally misleading, Defendants knew them to be false and intentionally misleading, or made them with reckless disregard for the truth or falsity, and each statement constitutes defamation and defamation *per se.*

95.    Mr. Wade and Ms. Camacho attempted to dissuade Ms. Shapiro from reading the termination letter and attachment while there, instead encouraging her to take it with her and read later.

96.    Notwithstanding the pressure from Mr. Wade and Ms. Camacho to leave with the letter and attachment, Ms. Shapiro read the termination letter and attachment while remaining in the meeting.

97.    When she had finished reading, Ms. Shapiro, stunned, looked directly at Mr. Wade and asked if he actually believed anything contained in the termination letter and attachment.

98.    Mr. Wade, looking extremely uncomfortable, told Ms. Shapiro he had been instructed not to engage in any dialogue with her.  Significantly, Mr. Wade did not state that he believed these statements to be true.

99.    In fact, Mr. Wade knew the statements contained in the termination letter and attachment to be false, intentionally misleading and defamatory.

100.    Katten Muchin, Mr. Morrison and Mr. Spurlock, the authors of the termination letter attachment, published this to Mr. Paul, Mr. Wade, Ms. Camacho, and were responsible and liable for the publication and republication each of the statements made in the letter.

101.    No privilege attaches, as Katten Muchin, Mr. Morrison and Mr. Spurlock did not represent MakeOffices, and their communications with Mr. Paul and Mr. Wade relating to Ms. Shapiro had been waived.

102.    In addition to the publication of the false and defamatory statements in the letter to Ms. Camacho, a third party not employed by MakeOffices, Mr. Wade published the termination letter and attachments to others, including Chris Junior.

103.    In addition, Katten Muchin, Mr. Morrison and Mr. Spurlock, the authors of the termination letter attachment, published the false and defamatory statements to Mr. Paul, Mr. Wade, and Ms. Camacho, and were responsible and liable for the publication and republication of these statements.

104.    The attorney-client privilege relationship between and among  Katten Muchin, Mr. Morrison and Mr. Spurlock, and Mr. Paul, Mr. Wade and/or MakeOffices (to the extent one is claimed) have been waived.

105.    After Ms. Shapiro was terminated, Mr. Wade made the following statements to other individuals:

    a)  That he met with Katten Muchin, Mr. Morrison and Mr. Spurlock on Saturday (June 17, 2017);

    b)  At the June 17, 2017 meeting, Katten Muchin, Mr. Morrison and Mr. Spurlock ordered him to terminate Ms. Shapiro on June 19, 2017;

c) That Mr. Wade met with his counsel on Saturday, June 17, 2017, and that his counsel told him that he "had to fire [Ms. Shapiro] on Monday."

d) That Mr. Wade was ordered to fire Ms. Shapiro;

e) He did not agree with the decision to terminate Ms. Shapiro, but had no choice;

f) That he had "f*cked up" by not telling other MakeOffices employees in advance of [Ms. Shapiro's] termination, explaining that the decision was incredibly sudden as his counsel had just instructed him just days before;

g) That Ms. Shapiro was terminated for "legal reasons;"

h) That Ms. Shapiro "knew more about Mr. Rahbar's wrongdoings than she had let on;"

i) That "[Mr. Wade] f*cked up, [he] know[s] [he] f*cked up" in regards to Ms. Shapiro's termination;

j) That Ms. Shapiro "may be back, its not the end necessarily," but then said "no, she wouldn't work here [though].

106.    Any privileges associated with the statements made in the termination letter and attachment have been waived.  MakeOffices terminated the employment of Ms. Shapiro due to the interference of Katten Muchin, Mr. Morrison, Mr. Spurlock, Mr. Paul and Mr. Wade, which included defamation, conspiracy, invasion of privacy and conspiracy.

107.    MakeOffices, with the other Defendants' conspiracy and participation, terminated Ms. Shapiro because of their discriminatory and retaliatory animus towards Ms. Shapiro, and because she would not engage in illegal and unethical conduct.

**Ms. Shapiro's Severance Agreement**

108.    On July 18, 2016, MakeOffices, with an agreement negotiated and finalized

through MakeOffices' outside counsel DLA Piper, presented Ms. Shapiro a Severance

Agreement, for the purpose of retaining Ms. Shapiro as a key employee in light of the instability

that had been created by the shareholder dispute and the ultimate denial of granting shares earlier

promised to Ms. Shapiro and the other key employees.

109.    The Severance Agreement provided that in the event Ms. Shapiro was terminated

without cause prior to July 18, 2017, she was to receive a severance amount of $200,000 upon

the termination of her employment.

110.    Ms. Shapiro accepted the Severance Agreement.

111.    Katten Muchin, Mr. Morrison and Mr. Spurlock were aware of this Severance

Agreement.

112.    Mr. Paul and Mr. Wade were aware of the Severance Agreement.

113.    Katten Muchin, Mr. Morrison and Mr. Spurlock intentionally interfered with Ms.

Shapiro's Severance Agreement by defaming Ms. Shapiro relating to the propriety of,

involvement in and other related claims, as set forth in ¶¶ 93 (k), (o) and (p) above, falsely stated

that Ms. Shapiro's involvement in the Severance Agreement was "self-dealing," even though the

involvement Ms. Shapiro had in the Severance Agreements was perfectly ethical, appropriate

and typical for General Counsels in similar circumstances, and in discriminating and retaliating

against Ms. Shapiro and aiding and abetting other Defendants to discriminate and retaliate

against Ms. Shapiro, defaming Ms. Shapiro, invading her privacy and intentionally inflicting

emotional distress on Ms. Shapiro, leading to the false depiction of Ms. Shapiro's termination as "for cause."

114.    Such conduct as described above was engaged in with the express purpose of interfering with Ms. Shapiro's Severance Agreement, and causing MakeOffices to breach its Agreement with Ms. Shapiro, and not pay her the severance payment under the Agreement.

115.    MakeOffices has breached the Severance Agreement by falsely stating that Ms. Shapiro was terminated for cause, and for refusing to pay the severance amount since terminating Ms. Shapiro.

**The Retaliatory EDVA Action**

116.    Ms. Shapiro filed the instant action (the "DC Action") against the Defendants on August 2, 2017.  In it, Ms. Shapiro states claims under the D.C. Human Rights Act, Computer Fraud and Abuse Act, breach of contract, and state law claims for invasion of privacy, defamation, tortious interference with contract, intentional infliction of emotional distress, and conspiracy.

117.    Approximately two weeks later, MakeOffices – represented by Katten Muchin, Mr. Morrison, and Mr. Spurlock – filed yet another lawsuit titled *MakeOffices, LLC v. Bredehoft, et. al.*, 2017-11482, in Fairfax County Circuit Court against Ms. Shapiro and her counsel, Mr. Rahbar and his counsel, and the forensic services firm that had been assisting Mr. Rahbar.  This litigation has since been removed to the U.S. District Court for the Eastern District of Virginia (the "EDVA Action.")

118.    The EDVA Action is wholly retaliatory, and the Complaint in the EDVA Action explicitly cites one basis of the lawsuit as the DC Action filed by Ms. Shapiro against the company.

119.     The Complaint continues Defendants' pattern and practice of attempting to tarnish Ms. Shapiro's reputation by implicating Ms. Shapiro in conduct that she had no involvement in, making baseless accusations as to her motives, actions, and intent, and of intimidating Ms. Shapiro through attacks on her counsel.

120.     The EDVA Action constitutes retaliation against Ms. Shapiro for her refusal to cooperate with Defendants' fraudulent proposal, complaints as to discrimination on the basis of her gender, complaints as to retaliatory termination, and for her legitimate filing of a lawsuit alleging these facts in the DC Action.

**Motion to Disqualify and For Sanctions**

121.     Defendants in the Second Fairfax Action also filed a renewed Motion to Disqualify on August 10, 2017, or one day after learning that Ms. Shapiro had filed the DC Action alleging discrimination and retaliation on the part of the Defendants in this case.

122.     In their motion, the Defendants bringing the renewed Motion to Disqualify and for Sanction explicitly cite the filing of the DC Action as the *sole* basis for the motion.  The Motion to Disqualify and for Sanctions is therefore explicit retaliation for Ms. Shapiro's exercise of her rights under the DC Human Rights Act.

123.     The Fairfax Circuit Court denied the Motion.

**COUNT I -**
**AIDING AND ABETTING RETALIATION**
**IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**(Against S. Scott Morrison, Katten Muchin, Daniel C. Spurlock and Ronald D. Paul)**

124.     The foregoing allegations are incorporated as if re-alleged herein.

125.    Pursuant to D.C. Code § 2-1402.62:

It shall be an unlawful discriminatory practice for any person to aid,
abet, invite, compel, or coerce the doing of any of the acts forbidden
under the provisions of this chapter or to attempt to do so.

126.    Ms. Shapiro was wrongfully terminated from her position in violation of the D.C.

Human Rights Act.

127.    Ms. Shapiro was wrongfully terminated in the District of Columbia.

128.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, and Mr. Spurlock

aided MakeOffices' retaliatory termination of Ms. Shapiro's employment in violation of the DC

Human Rights Act by communicating false and defamatory statements to Mr. Paul and Mr.

Wade, conducting illegal and unethical searches of Ms. Shapiro's emails, intentionally inflicting

emotional distress upon Ms. Shapiro, preparing false and defamatory statements in a termination

letter and attachment to create a false reason to terminate Ms. Shapiro for cause, directing Mr.

Wade to terminate Ms. Shapiro, and demanding that Ms. Shapiro sign an agreement that would

cause her to condone and participate in illegal and unethical conduct.

129.    Ms. Shapiro was retained as General Counsel and Chief of Staff of MakeOffices

when Mr. Wade became CEO of the company April 10, 2017, Ms. Shapiro was told by Mr. Paul

and Mr. Wade that she was extremely valued and highly respected and that they believed she had

done nothing wrong while she was the General Counsel and Chief of Staff and in fact, had done

the right things, and they wanted to retain her.

130.    Ms. Shapiro was in fact retained as General Counsel and Chief of Staff, and was

given work that involved a high level of trust.

131.    Ms. Shapiro was praised repeatedly by Mr. Wade for her performance.

132.    None of the alleged conduct in the termination letter and attachment had anything to do with Ms. Shapiro's job performance between April 10, 2017 and June 19, 2017.

133.    Ms. Shapiro performed her job as General Counsel and Chief of Staff without any performance criticisms until her wrongful termination in June 19, 2017.

134.    Ms. Shapiro had a reasonable expectation of continued employment with MakeOffices.

135.    As of June 16, 2017, Mr. Wade, the CEO of MakeOffices did not have an intent to terminate Ms. Shapiro.

136.    As set forth above, Katten Muchin, Mr. Morrison, and Mr. Spurlock directed Mr. Wade to terminate Ms. Shapiro.

137.    Mr. Paul was complicit in and participated in the decision to terminate Ms. Shapiro and in the decision to provide false and defamatory reasons for the termination in discriminatory and retaliatory animus towards Ms. Shapiro, and joined in the direction to terminate Ms. Shapiro.

138.    Mr. Wade admitted that he knew the reasons for Ms. Shapiro's termination were false, yet he terminated her and gave her a document (termination letter and attachment) that he knew to be false and defamatory, and he knew the real reason for the termination was discriminatory and retaliatory animus towards Ms. Shapiro.

139.    Katten Muchin, Mr. Morrison, and Mr. Spurlock were personally and professionally motivated to aid retaliatory termination against Ms. Shapiro to conceal discriminatory and retaliatory conduct, as well as illegal and unethical conduct.

140.    Mr. Paul was personally motivated to aid discriminatory and retaliatory termination against Ms. Shapiro.  After Katten Muchin, Mr. Morrison and Mr. Spurlock falsely

claimed to Mr. Paul that Ms. Shapiro was responsible for the termination of his daughter, Robin Paul Nelson, Mr. Paul turned against Ms. Shapiro and acted with discriminatory and retaliatory animus towards Ms. Shapiro.

141.    Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul were personally motivated to aid retaliatory termination against Ms. Shapiro out of personal rage against her.

142.    Katten Muchin, Mr. Morrison and Mr. Spurlock represent MRP UO Partners, LLC; a company owned in part by Mr. Paul and at which Mr. Wade is a Director.

143.    Through this connection as counsel for MRP UO, Katten Muchin and Mr. Paul aided and abetted retaliation by ordering Zach Wade to terminate Ms. Shapiro.

144.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul discriminated and retaliated against Ms. Shapiro by coercing, encouraging, instructing and requesting MakeOffices through Mr. Wade to engage in prohibited acts under the D.C. Human Rights Act by taking action against her due to her pregnancy status and health conditions, as well as in retaliation for Ms. Shapiro's questioning and objecting to her discriminatory treatment and assertion of her rights not to be discriminated against or targeted because of her health conditions and pregnancy or because she is a woman.

145.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul discriminated against Ms. Shapiro in violation of the rights granted to her under the D.C. Human Rights Act.

146.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul discriminated and retaliated against Ms. Shapiro by coercing, threatening, and interfering with Ms. Shapiro's rights as granted to her under the D.C. Human Rights Act.

147.    The Defendants, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul's discriminatory and retaliatory conduct was intentional, and it evinced ill will, recklessness, and willful disregard of Ms. Shapiro's rights, as well as wantonness, oppressiveness, maliciousness, and a spirit of mischief, and therefore punitive damages are warranted and requested.

148.    The Defendants, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul's discriminatory and retaliatory conduct had the effect and consequence of violating the D.C. Human Rights Act.

149.    The proffered legitimate business justification for terminating Ms. Shapiro, as stated in the termination letter and attachment is false, and Defendants knew they were false, and they had nothing to do with Ms. Shapiro's job performance, especially during the time Mr. Wade was CEO leading up to the termination.

150.    Mr. Morrison and Mr. Spurlock are partners of the law firm Katten Muchin.

151.    Mr. Morrison and Mr. Spurlock are individually liable to Ms. Shapiro.

152.    Katten Muchin is vicariously liable for the actions of its Partners and Employees.

153.    As a direct and proximate result of Defendants' actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant or having a young baby, fear of not being hired because of Defendants' defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and

benefits of employment, lost career and business opportunities and advancement, and medical

expenses.  Ms. Shapiro has also experienced physical symptoms while thinking about or

discussing her former employer, including but not limited to severe panic attacks, nausea and

becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other

potential employers, friends and relatives have heard the highly offensive, false and defamatory

statements about her, and whether this will cause her to be unable to obtain and/or sustain

employment.  Defendants' conduct has irreparably harmed Ms. Shapiro's quality of life,

professionally and personally.

154.    Ms. Shapiro has also incurred attorneys' fees and costs as a result of Defendants'

actions.

155.    Due to the severity of Defendants' willful, wanton, oppressive, and deliberate

conduct Ms. Shapiro is entitled to punitive damages.

**COUNT II -**
**AIDING AND ABETTING GENDER DISCRIMINATION**
**IN THE TERMINATION OF EMPLOYMENT**
**IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**(Against S. Scott Morrison, Katten Muchin, Daniel C. Spurlock and Ronald D. Paul)**

156.    The foregoing allegations are incorporated as if re-alleged herein.

157.    Pursuant to D.C. Code § 2-1402.62:

It shall be an unlawful discriminatory practice for any person to aid, abet,
invite, compel, or coerce the doing of any of the acts forbidden under the
provisions of this chapter or to attempt to do so.

158.    Pursuant to D.C. Code § 2-1402.11:

It shall be an unlawful discriminatory practice to do any of the following
acts, wholly or partially for a discriminatory reason based upon . . .gender
. . .

159.    Ms. Shapiro was wrongfully terminated from her position in violation of the D.C. Human Rights Act.

160.    Ms. Shapiro was wrongfully terminated in the District of Columbia.

161.    Ms. Shapiro is a female.

162.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, and Mr. Spurlock aided MakeOffices' discriminatory and retaliatory termination of Ms. Shapiro's employment because of her gender in violation of the D.C. Human Rights Act by communicating false and defamatory statements to Mr. Paul and Mr. Wade, conducting illegal and unethical searches of Ms. Shapiro's emails, intentionally inflicting emotional distress upon Ms. Shapiro, preparing false and defamatory statements in a termination letter and attachment to create a false reason to terminate Ms. Shapiro for cause, directing Mr. Wade to terminate Ms. Shapiro, and demanding that Ms. Shapiro sign an agreement that would cause her to condone and participate in illegal and unethical conduct.

163.    Ms. Shapiro was retained as General Counsel and Chief of Staff of MakeOffices when Mr. Wade became CEO of the company April 10, 2017, Ms. Shapiro was told by Mr. Paul and Mr. Wade that she was extremely valued and highly respected and that they believed she had done nothing wrong while she was the General Counsel and Chief of Staff and in fact, had done the right things, and they wanted to retain her.

164.    Ms. Shapiro was in fact retained as General Counsel and Chief of Staff, and was given work that involved a high level of trust.

165.    Ms. Shapiro was praised repeatedly by Mr. Wade for her performance.

166.    None of the alleged conduct in the termination letter and attachment had anything to do with Ms. Shapiro's job performance between April 10, 2017 and June 19, 2017.

33

167.    Ms. Shapiro performed her job as General Counsel and Chief of Staff without any performance criticisms until her wrongful termination in June 19, 2017.

168.    Ms. Shapiro had a reasonable expectation of continued employment with MakeOffices.

169.    As of June 16, 2017, Mr. Wade, the CEO of MakeOffices did not have an intent to terminate Ms. Shapiro.

170.    As set forth above, Katten Muchin, Mr. Morrison, and Mr. Spurlock directed Mr. Wade to terminate Ms. Shapiro.

171.    Mr. Paul was complicit in and participated in the decision to terminate Ms. Shapiro and in the decision to provide false and defamatory reasons for the termination in discriminatory and retaliatory animus towards Ms. Shapiro, and joined in the direction to terminate Ms. Shapiro.

172.    Mr. Wade admitted that he knew the reasons for Ms. Shapiro's termination were false, yet he terminated her and gave her a document (termination letter and attachment) that he knew to be false and defamatory, and he knew the real reason for the termination was discriminatory and retaliatory animus towards Ms. Shapiro.

173.    Katten Muchin, Mr. Morrison, and Mr. Spurlock were personally and professionally motivated to aid in the discriminatory and retaliatory termination against Ms. Shapiro to conceal discriminatory and retaliatory conduct, as well as illegal and unethical conduct.

174.    Mr. Paul was personally motivated to aid discriminatory and retaliatory termination against Ms. Shapiro.  After Katten Muchin, Mr. Morrison and Mr. Spurlock falsely claimed to Mr. Paul that Ms. Shapiro was responsible for the termination of his daughter, Robin

Paul Nelson, Mr. Paul turned against Ms. Shapiro and acted with discriminatory and retaliatory animus towards Ms. Shapiro.

175.    Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul were personally motivated to aid in the discriminatory and retaliatory termination against Ms. Shapiro out of personal rage against her and perceived damages to their egos because of her.

176.    Katten Muchin, Mr. Morrison and Mr. Spurlock represent MRP UO Partners, LLC; a company owned in part by Mr. Paul and at which Mr. Wade is a Director.

177.    Through this connection as counsel for MRP UO, Katten Muchin and Mr. Paul aided and abetted retaliation by ordering Zach Wade to terminate Ms. Shapiro.

178.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul discriminated and retaliated against Ms. Shapiro by coercing, encouraging, instructing and requesting MakeOffices through Mr. Wade to engage in prohibited acts under the D.C. Human Rights Act by taking action against her due to her pregnancy status and health conditions, as well as in retaliation for Ms. Shapiro's questioning and objecting to her discriminatory treatment and assertion of her rights not to be discriminated against or targeted because of her health conditions and pregnancy or because she is a woman.

179.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul discriminated against Ms. Shapiro in violation of the rights granted to her under the D.C. Human Rights Act.

180.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul discriminated and retaliated against Ms. Shapiro by coercing, threatening, and interfering with Ms. Shapiro's rights as granted to her under the D.C. Human Rights Act.

181.    The proffered legitimate business justification for terminating Ms. Shapiro, as stated in the termination letter and attachment is false, and Defendants knew they were false, and had nothing to do with Ms. Shapiro's job performance, especially during the time Mr. Wade was CEO leading up to the termination.

182.    The Defendants, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul's discriminatory and retaliatory conduct was intentional, and it evinced ill will, recklessness, and willful disregard of Ms. Shapiro's rights, as well as wantonness, oppressiveness, maliciousness, and a spirit of mischief, and therefore punitive damages are warranted and requested.

183.    The Defendants, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul's discriminatory and retaliatory conduct had the effect and consequence of violating the D.C. Human Rights Act.

184.    Mr. Morrison and Mr. Spurlock are partners of the law firm Katten Muchin.

185.    Mr. Morrison and Mr. Spurlock are individually liable to Ms. Shapiro.

186.    Katten Muchin is vicariously liable for the actions of its Partners and Employees.

187.    As a direct and proximate result of Defendants' actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant or having a young baby, fear of not being hired because of Defendants' defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and

benefits of employment, lost career and business opportunities and advancement, and medical expenses. Ms. Shapiro has also experienced physical symptoms while thinking about or discussing her former employer, including but not limited to severe panic attacks, nausea and becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other potential employers, friends and relatives have heard the highly offensive, false and defamatory statements about her, and whether this will cause her to be unable to obtain and/or sustain employment. Defendants' conduct has irreparably harmed Ms. Shapiro's quality of life, professionally and personally.

188.    Ms. Shapiro has also incurred attorneys' fees and costs as a result of Defendants' conduct.

189.    Due to the severity of Defendants' willful, wanton, oppressive, and deliberate conduct Ms. Shapiro is entitled to punitive damages.

## COUNT III -
## AIDING AND ABETTING DISCRIMINATION OF FAMILY RESPONSIBILITIES IN THE TERMINATION OF EMPLOYMENT IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### (Against S. Scott Morrison, Katten Muchin, Daniel C. Spurlock and Ronald D. Paul)

190.    The foregoing allegations are incorporated as if re-alleged herein.

191.    Pursuant to D.C. Code § 2-1402.62:

It shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so.

192.    Pursuant to D.C. Code § 2-1402.11:

It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon . . . family responsibilities . . .

193.    Ms. Shapiro was wrongfully terminated in the District of Columbia.

194.    Ms. Shapiro is, and was at all times materially hereto, pregnant.

195.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, and Mr. Spurlock aided MakeOffices' discriminatory and retaliatory termination of Ms. Shapiro's employment on the basis of her pregnant condition, in violation of the DC Human Rights Act by communicating false and defamatory statements to Mr. Paul and Mr. Wade, conducting illegal and unethical searches of Ms. Shapiro's emails, intentionally inflicting emotional distress upon Ms. Shapiro, preparing false and defamatory statements in a termination letter and attachment to create a false reason to terminate Ms. Shapiro for cause, directing Mr. Wade to terminate Ms. Shapiro, and demanding that Ms. Shapiro sign an agreement that would cause her to condone and participate in illegal and unethical conduct.

196.    Ms. Shapiro was retained as General Counsel and Chief of Staff of MakeOffices when Mr. Wade became CEO of the company April 10, 2017, Ms. Shapiro was told by Mr. Paul and Mr. Wade that she was extremely valued and highly respected and that they believed she had done nothing wrong while she was the General Counsel and Chief of Staff and in fact, had done the right things, and they wanted to retain her.

197.    Ms. Shapiro was in fact retained as General Counsel and Chief of Staff, and was given work that involved a high level of trust.

198.    Ms. Shapiro was praised repeatedly by Mr. Wade for her performance.

199.    None of the alleged conduct in the termination letter and attachment had anything to do with Ms. Shapiro's job performance between April 10, 2017 and June 19, 2017.

200.    Ms. Shapiro performed her job as General Counsel and Chief of Staff without any performance criticisms until her wrongful termination in June 19, 2017.

38

201.    Ms. Shapiro had a reasonable expectation of continued employment with MakeOffices and would have had a period of paid maternity leave following the birth of her child.

202.    As of June 16, 2017, Mr. Wade, the CEO of MakeOffices did not have an intent to terminate Ms. Shapiro.

203.    As set forth above, Katten Muchin, Mr. Morrison, and Mr. Spurlock directed Mr. Wade to terminate Ms. Shapiro.

204.    Mr. Paul was complicit in and participated in the decision to terminate Ms. Shapiro and in the decision to provide false and defamatory reasons for the termination in discriminatory and retaliatory animus towards Ms. Shapiro, and joined in the direction to terminate Ms. Shapiro.

205.    The proffered legitimate business justification for terminating Ms. Shapiro, as stated in the termination letter and attachment is false, and Defendants knew they were false, and they had nothing to do with Ms. Shapiro's job performance, especially during the time Mr. Wade was CEO leading up to the termination.

206.    Mr. Wade admitted that he knew the reasons for Ms. Shapiro's termination were false, yet he terminated her and gave her a document (termination letter and attachment) that he knew to be false and defamatory, and he knew the real reason for the termination was discriminatory and retaliatory animus towards Ms. Shapiro.

207.    Katten Muchin, Mr. Morrison, and Mr. Spurlock were personally and professionally motivated to aid in the discriminatory and retaliatory termination against Ms. Shapiro to conceal discriminatory and retaliatory conduct, as well as illegal and unethical conduct.

208.    Mr. Paul was personally motivated to aid discriminatory and retaliatory termination against Ms. Shapiro.  After Katten Muchin, Mr. Morrison and Mr. Spurlock falsely claimed to Mr. Paul that Ms. Shapiro was responsible for the termination of his daughter, Robin Paul Nelson, Mr. Paul turned against Ms. Shapiro and acted with discriminatory and retaliatory animus towards Ms. Shapiro.

209.    Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul were personally motivated to aid retaliatory termination against Ms. Shapiro out of personal rage against her and perceived damages to their egos because of her.

210.    Katten Muchin, Mr. Morrison and Mr. Spurlock represent MRP UO Partners, LLC; a company owned in part by Mr. Paul and at which Mr. Wade is a Director.

211.    Through this connection as counsel for MRP UO, Katten Muchin and Mr. Paul aided and abetted retaliation by ordering Zach Wade to terminate Ms. Shapiro.

212.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul discriminated and retaliated against Ms. Shapiro by coercing, encouraging, instructing and requesting MakeOffices through Mr. Wade to engage in prohibited acts under the D.C. Human Rights Act by taking action against her due to her pregnancy status and health conditions, as well as in retaliation for Ms. Shapiro's questioning and objecting to her discriminatory treatment and assertion of her rights not to be discriminated against or targeted because of her health conditions and pregnancy or because she is a woman.

213.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul discriminated against Ms. Shapiro in violation of the rights granted to her under the D.C. Human Rights Act.

214.    Based on the conduct as alleged, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul discriminated and retaliated against Ms. Shapiro by coercing, threatening, and interfering with Ms. Shapiro's rights as granted to her under the D.C. Human Rights Act.

215.    The Defendants, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul's discriminatory and retaliatory conduct was intentional, and it evinced ill will, recklessness, and willful disregard of Ms. Shapiro's rights, as well as wantonness, oppressiveness, maliciousness, and a spirit of mischief, and therefore punitive damages are warranted and requested.

216.    The Defendants, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul's discriminatory and retaliatory conduct had the effect and consequence of violating the D.C. Human Rights Act.

217.    Mr. Morrison and Mr. Spurlock are partners of the law firm Katten Muchin.

218.    Mr. Morrison and Mr. Spurlock are individually liable to Ms. Shapiro.

219.    Katten Muchin is vicariously liable for the actions of its Partners and Employees.

220.    As a direct and proximate result of Defendants' actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant or having a young baby, fear of not being hired because of Defendants' defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and medical

41

expenses.  Ms. Shapiro has also experienced physical symptoms while thinking about or discussing her former employer, including but not limited to severe panic attacks, nausea and becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other potential employers, friends and relatives have heard the highly offensive, false and defamatory statements about her, and whether this will cause her to be unable to obtain and/or sustain employment.  Defendants' conduct has irreparably harmed Ms. Shapiro's quality of life, professionally and personally.

221.    Ms. Shapiro has also incurred attorneys' fees and costs as a result of Defendants' conduct.

222.    Due to the severity of Defendants' willful, wanton, oppressive, and deliberate conduct Ms. Shapiro is entitled to punitive damages.

**COUNT IV –**
**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**
**(Against MakeOffices, LLC, S. Scott Morrison,**
**Katten Muchin, Daniel C. Spurlock and Zach Wade)**

223.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

224.    MakeOffices protects its confidential, proprietary and trade secret information on a secure computer system to which access is limited and password-protected.

225.    MakeOffices' computer system is secured to ensure that personal, confidential, proprietary, and trade secret business information is not kept or accessed outside of the secure computer system.

226.    As General Counsel and Chief of Staff, Ms. Shapiro had a reasonable expectation of privacy for her emails, especially because of the role she played in communicating with other counsel, including outside corporate counsel, as part of her job responsibilities.

227.    Ms. Shapiro kept private personal emails at her MakeOffices email account that was password protected.

228.    Ms. Shapiro kept private work emails at her MakeOffices email account that was password protected.

229.    Ms. Shapiro discussed private facts from her work email account at MakeOffices.

230.    As General Counsel for MakeOffices Ms. Shapiro engaged in private and confidential communications with corporate counsel through her MakeOffices email account.

231.    Ms. Shapiro had a reasonable expectation of privacy in maintaining both private and work communications on her email account, given her position with MakeOffices of General Counsel and Chief of Staff and also the protections of the Court, the Rules of Professional Responsibility, the appropriate Ethics Rules and the law.

232.    S. Scott Morrison, Katten Muchin, and Daniel C. Spurlock, knowing that they were not allowed to access the email accounts, gained illegal access to and intentionally intruded through an improper investigation of emails which Ms. Shapiro had an expectation of privacy.

233.    S. Scott Morrison, Katten Muchin, and Daniel C. Spurlock were not counsel for MakeOffices at the time the searches were conducted.

234.    S. Scott Morrison, Katten Muchin, and Daniel C. Spurlock raided Ms. Shapiro's emails without consent, authorization or knowledge of the Majority Shareholder of MakeOffices, without informing the Board of Directors, without informing Ms. Shapiro and knowing that what they were doing was unlawful. Specifically, in early June 2017 and continuing to the present, Katten Muchin, Mr. Morrison and Mr. Spurlock accessed the emails of Ms. Shapiro at MakeOffices.

235.    During June 2017, the searches the Katten Muchin, Mr. Morrison and Mr. Spurlock ran included words "F**k," "c**t," "sex," "sexy," and a variety of other grotesque, outrageous, sexually-explicit, and gender-based search terms.

236.    These explicit gender-based search terms were intended to cause Ms. Shapiro distress, embarrassment, and discomfort, and to intimidate Ms. Shapiro.

237.    These explicit gender-based search terms were conducted with the intent for the searches and search results to be disclosed to Ms. Shapiro, MakeOffices employees, and other parties.

238.    Katten Muchin, Mr. Morrison, and Mr. Spurlock also searched Ms. Shapiro's emails for highly sensitive attorney-client protected communications.

239.    The emails also included MakeOffices' privileged emails with its counsel, through Ms. Shapiro as former General Counsel.

240.    Katten Muchin, Mr. Morrison and Mr. Spurlock did not represent MakeOffices at the time and did not have legal authority or legitimate basis to invade MakeOffices' privileged emails.

241.    Katten Muchin, Mr. Morrison and Mr. Spurlock were legally obligated for a number of reasons to notify Ms. Shapiro of its intent to access and read her email and to obtain Ms. Shapiro's consent or a Court Order.

242.    By invading the privacy of her emails, Katten Muchin, Mr. Morrison and Mr. Spurlock violated their obligation to work with Ms. Shapiro to preserve the confidences of the communications between Ms. Shapiro and her prior counsel.

243.    By invading the privacy of her emails, Katten Muchin, Mr. Morrison and Mr. Spurlock violated their obligation to preserve the confidences of the communications of any client of Ms. Shapiro, including MakeOffices.

244.    Between June 27, 2017 and July 1, 2017, Katten Muchin ran the following searches of Ms. Shapiro's email account: "Undertaking," "Indemnified," "Attorneys Fees," "Ginsburg," "Dimuro," "Bredehoft," "Invoice," "Ethical Duties," "Aid and Direction," "Clark Hill," "Bankroft," "Thorson," "JP Law / Sherry," "Legal@makeoffices.com," "attorney invoice," "Sage Johnson," and "Freeman."

245.    Katten Muchin, Mr. Morrison and Mr. Spurlock conducted the unlawful searches without Ms. Shapiro's consent and were deliberately searching for privileged and private communications.

246.    Katten Muchin, Mr. Morrison and Mr. Spurlock conducted the unlawful searches without the knowledge, consent or authority of Ms. Shapiro.

247.    Katten Muchin, Mr. Morrison and Mr. Spurlock had no legally recognized authority, express, implied, or otherwise, to conduct the searches or review MakeOffices and Ms. Shapiro's private and, in some cases, privileged emails, and these searches and review were illegal.

248.    Mr. Morrison and Mr. Spurlock are partners of the law firm Katten Muchin.

249.    Mr. Morrison and Mr. Spurlock are individually liable to Ms. Shapiro.

250.    Katten Muchin is vicariously liable for the actions of its partners and employees.

251.    Zach Wade, in his capacity as Director of MRP UO, was aware of and assisted S. Scott Morrison, Katten Muchin, and Daniel C. Spurlock for the purpose of intruding upon Ms.

Shapiro's emails through an improper and illegal investigation of which she had a legitimate expectation of privacy.

252.    Defendants intentionally accessed Ms. Shapiro's protected MakeOffices email account, through an improper investigation, and conducted sexually explicit and harassing keyword searches with the intent of causing Ms. Shapiro distress.

253.    Defendants intentionally accessed Ms. Shapiro's protected MakeOffices email account, and conducted keyword searches with the names of all her counsel with the intent learning privileged information to use against her.

254.    Defendants' searches were unauthorized or exceeded authorized access. Moreover, given Ms. Shapiro's work as General Counsel and Chief of Staff, and her communications with outside corporate counsel and the access to her own counsel's communications, the Defendants had no authority to access the email.

255.    The MakeOffices' Operating Agreement does not permit the company's officers – including the CEO – to authorize access to MakeOffices' computer systems for the purposes of conducting sexually explicit searches, harassing company employees, or invading attorney client privileges, which is what occurred here.

256.    Defendants obtained information from Ms. Shapiro's email account as a result of their searches.

257.    The intrusion by Defendants is highly offensive to an ordinary, reasonable person.

258.    By allowing S. Scott Morrison, Katten Muchin, and Daniel C. Spurlock, to access Ms. Shapiro's emails Mr. Wade is liable to her for invasion of privacy.

259.    By accessing Ms. Shapiro's emails, S. Scott Morrison, Katten Muchin, and Daniel C. Spurlock are liable to Ms. Shapiro for invasion of privacy.

260.    The Defendants, Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Wade's invasion of privacy and related conduct was intentional, and evinced ill will, recklessness, and willful disregard of Ms. Shapiro's rights, as well as wantonness, oppressiveness, maliciousness, and a spirit of mischief, and therefore punitive damages are warranted and requested.

261.    As a direct and proximate result of Defendants' actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant or having a young baby, fear of not being hired because of Defendants' defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and medical expenses.  Ms. Shapiro has also experienced physical symptoms while thinking about or discussing her former employer, including but not limited to severe panic attacks, nausea and becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other potential employers, friends and relatives have heard the highly offensive, false and defamatory statements about her, and whether this will cause her to be unable to obtain and/or sustain employment.  Defendants' conduct has irreparably harmed Ms. Shapiro's quality of life, professionally and personally.

262.    Ms. Shapiro has also incurred attorneys' fees and costs as a result of Defendants' conduct.

263.     Due to the severity of Defendants' willful, wanton, oppressive, and deliberate conduct Ms. Shapiro is entitled to punitive damages.

**COUNT V**
**VIOLATION OF THE COMPUTER FRAUD**
**AND ABUSE ACT, 18 USC § 1030, et seq.**
**(Against Katten Muchin, S. Scott Morrison and Daniel C. Spurlock)**

264.     The foregoing allegations are incorporated as realleged herein.

265.     MakeOffices protects its confidential, proprietary and trade secret information on a secure computer system to which access is limited and password-protected.

266.     MakeOffices' computer system is secured to ensure that personal, confidential, proprietary, and trade secret business information is not kept or accessed outside of the secure computer system.

267.     MakeOffices' employee emails constitute computer data.

268.     While prevented by the law, the Rules of Professional Responsibility, relevant Ethics Rules, and a Court Order, Katten Muchin, Mr. Morrison and Mr. Spurlock obtained unfettered access to all of MakeOffices' email accounts, and also obtained the ability to run searches on these accounts, as described earlier and specifically in Count IV above.

269.     Katten Muchin, Mr. Morrison and Mr. Spurlock intentionally accessed Ms. Shapiro's protected MakeOffices email account, and conducted sexually explicit and harassing keyword searches, as well as invading attorney client privileges with the intent of causing Ms. Shapiro distress.

270.     Katten Muchin and Mr. Spurlock's searches were unauthorized or exceeded authorized access.

271.     Katten Muchin had no authority to access Ms. Shapiro's email because of her privileged communications, attorney client privileged emails in both her capacity as

MakeOffices' General Counsel and as a client represented by counsel in the Fairfax lawsuit which was under a Court-ordered Stay.

272.    On the dates of the unauthorized searches, Katten Muchin, Mr. Spurlock, and Mr. Morrison represented an adverse party to MakeOffices.

273.    The MakeOffices Operating Agreement does not permit the company's officers – including the CEO – to authorize access to MakeOffices' computer systems for the purposes of harassing company employees or invading attorney-client privileges, which was what occurred here.

274.    Katten Muchin, Mr. Morrison and Mr. Spurlock obtained private and confidential information from Ms. Shapiro's email account as a result of their searches.

275.    The unauthorized access by Katten Muchin, Mr. Morrison and Mr. Spurlock resulted in obtaining information from company protected computers.

276.    Katten Muchin, Mr. Morrison and Mr. Spurlock performed the illegal searches with the intent to use any information against Ms. Shapiro to cause her harm.

277.    Emails obtained from their searches were used to create false and defamatory statements and intentional misrepresentations in terminating Ms. Shapiro's employment for illegal reasons.

278.    Emails obtained from their searches were included in the June 19, 2017 termination letter and attachments.

279.    Mr. Morrison and Mr. Spurlock are partners of the law firm Katten Muchin.

280.    Mr. Morrison and Mr. Spurlock are individually liable to Ms. Shapiro for their conduct.

281.    Katten Muchin is vicariously liable for the actions of its partners and employees.

282.     As a result of Katten Muchin, Mr. Morrison and Mr. Spurlock's searches, Ms. Shapiro has sustained a loss of at least $5,000 in a one-year period.  The loss sustained includes, but is not limited to, loss of protected client confidences, loss of her own client confidences, invasion of privacy, loss of income, loss of severance payment, loss of her employment, and legal and forensics fees.

**COUNT VI**
**DEFAMATION AND DEFAMATION *PER SE***
**(Against S. Scott Morrison, Daniel C. Spurlock and Katten Muchin)**

283.     The foregoing allegations are incorporated as if re-alleged herein.

284.     Mr. Morrison, Mr. Spurlock and Katten Muchin made false, intentionally misleading and defamatory statements, and engaged in conduct that amounted to defamation and defamation *per se*, to third parties including Mr. Wade, Mr. Paul, and Ms. Camacho, and the false, intentionally misleading and defamatory statements were republished to other individuals, both in Washington D.C. and Virginia.

285.     The defamation includes all the statements set forth in ¶ 93 (a)–(y).

286.     The defamatory statements falsely allege Ms. Shapiro committed crimes and/or crimes of moral turpitude.

287.     The defamatory statements injure Ms. Shapiro in her profession by attacking her fitness to perform her profession as General Counsel and Chief of Staff of MakeOffices.

288.     These statements were intended to convey that Ms. Shapiro was unable to perform her duties as General Counsel and Chief of Staff in a competent and professional manner, and that she should be terminated.

289.     The defamatory statements falsely allege Ms. Shapiro committed crimes and/or crimes of moral turpitude.

290.     In addition, conducting the computer searches of sexually explicit words and words suggesting ethical violations as set forth in ¶ 60 and ¶ 64 for Ms. Shapiro's email accounts, which were published to the employees of MakeOffices, suggested that Ms. Shapiro was morally unfit, had engaged in crimes of moral turpitude, and was unfit in her job performance.  These searches also constitute defamatory statements.

291.     The defamatory statements injure Ms. Shapiro in her profession by attacking her fitness to perform her profession as General Counsel and Chief of Staff of MakeOffices.

292.     These statements were intended to convey that Ms. Shapiro was unable to perform her duties as General Counsel and Chief of Staff in a competent and professional manner, and that she should be terminated.

293.     These statements were used to terminate Ms. Shapiro "for cause."

294.     The conduct by Katten Muchin, Mr. Morrison and Mr. Spurlock, as described in greater detail above, was motivated by malice, evil, spite, ill-will, and evinced a conscious disregard for the rights of Ms. Shapiro.

295.     Katten Muchin, Mr. Morrison and Mr. Spurlock's words and actions caused prejudice to Ms. Shapiro in her professional reputation and ability to obtain employment.

296.     Katten Muchin, Mr. Morrison and Mr. Spurlock knew, or should have known, these statements and actions were false and intentionally portrayed Ms. Shapiro in a false and defamatory light, and/or made these statements and engaged in this conduct with reckless disregard as to whether the statements or conduct were false; the statements or conduct were unnecessarily insulting; the language or actions used were stronger than was necessary under the circumstances; and/or Mr. Morrison made the defamatory statements and engaged in defamatory

conduct because of hatred, ill will or a desire to injure Ms. Shapiro rather than a fair comment on the subject; and did cause injury to Ms. Shapiro.

297.     Katten Muchin, Mr. Morrison and Mr. Spurlock's statements concerning Ms. Shapiro were published to third parties, without privilege.

298.     Such comments and actions served to permanently damage Ms. Shapiro's reputation in the eyes of board members and employees of her company, and the CEO to whom she reported.

299.     There was no factual information to support the defamatory statements, and the statements were motivated by Katten Muchin, Mr. Morrison and Mr. Spurlock's desire to retaliate against Ms. Shapiro, as set forth in greater detail above.

300.     These materially false and misleading statements were made with the intent to harm, and did harm Ms. Shapiro's reputation and good will with MakeOffices, Mr. Wade, Mr. Paul, Ms. Camcho, Mr. Junior and others who became aware of the statements.

301.     The conduct of Katten Muchin, Mr. Morrison and Mr. Spurlock was made with ill-will, was malicious, wanton and evinced a willful and conscious disregard for Ms. Shapiro's reputation, and further was accomplished in a reckless and grossly negligent manner.

302.     Mr. Morrison and Mr. Spurlock are partners of Katten Muchin.

303.     Mr. Morrison and Mr. Spurlock are individually liable to Ms. Shapiro for their conduct.

304.     Katten Muchin is vicariously liable for the actions of its employees and partners.

305.     As a direct and proximate result of Defendants' actions, Ms. Shapiro has suffered and continues to suffer loss of good will, and damage to her personal and professional reputation and business.

306.    As a direct and proximate result of Defendants' actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant or having a young baby, fear of not being hired because of Defendants' defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and medical expenses.  Ms. Shapiro has also experienced physical symptoms while thinking about or discussing her former employer, including but not limited to severe panic attacks, nausea and becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other potential employers, friends and relatives have heard the highly offensive, false and defamatory statements about her, and whether this will cause her to be unable to obtain and/or sustain employment. Defendants' conduct has irreparably harmed Ms. Shapiro's quality of life, professionally and personally.

307.    Due to the character and severity of Defendants' willful, wanton, oppressive, and deliberate conduct Ms. Shapiro is entitled to punitive damages

**COUNT VII**
**TORTIOUS INTERFERENCE WITH**
**CONTRACT OR BUSINESS EXPECTANCY**
**(Against S. Scott Morrison, Katten Muchin,**
**Daniel C. Spurlock, Ronald D. Paul, and Zach Wade)**

308.    The foregoing allegations are incorporated as if realleged herein.

309.    Ms. Shapiro was been employed by MakeOffices since 2013 until June 19, 2017. She retained her position despite significant power struggles between the former and current CEOs, Mr. Rahbar and Mr. Wade, and has all times performed her duties in an adequate, if not exemplary, manner.

310.    Ms. Shapiro was a highly respected employee of MakeOffices and still enjoys a stellar reputation in the company.

311.    Ms. Shapiro had a significant probability and expectation of continued and significant future economic benefit with MakeOffices.

312.    Ms. Shapiro was retained as General Counsel and Chief of Staff of MakeOffices when Mr. Wade became CEO of the company April 10, 2017, was told by Mr. Paul and Mr. Wade that she was extremely valuable and highly respected in her position.

313.    Ms. Shapiro continued to be given responsibilities of trust.

314.    Ms. Shapiro performed her job responsibility without any criticism, and only praise, during the period of April 10, 2017 until her wrongful termination in June 19, 2017.

315.    Defendants employed improper means to interfere with Ms. Shapiro's employment relationship with MakeOffices.

316.    The "improper means" employed by the Defendants included all of the conduct set forth in detail in this Complaint, including, but not limited to discrimination and retaliation in violation of the D.C. Human Rights Act, invasion of privacy, computer trespass and defamation.

317.    Defendants' actions were willful, spiteful, filled with ill will, intentional, and malicious, and evinced a conscious disregard for the rights of Ms. Shapiro.

318.    The Defendants were aware of Ms. Shapiro's employment with MakeOffices and expectation of continued employment and intentionally interfered with it.

319.    Zach Wade intentionally interfered with Ms. Shapiro's employment by choosing to wrongfully terminate her even though he knew the reasons stated in the termination letter and attachments were false, and he knew that he would be leaving Ms. Shapiro without income at a time when she was six months' pregnant.

320.    Ron Paul exerts vast influence over MakeOffices, his company EagleBank, financed through UO Investors, LLC has provided millions of dollars in financing for MakeOffices.

321.    Ron Paul intentionally interfered with Ms. Shapiro's employment and business expectancies derived therefrom by participating in and directing Zach Wade to wrongfully terminate her.

322.    Katten Muchin, Mr. Morrison and Mr. Spurlock intentionally interfered with Ms. Shapiro's employment and business expectations derived therefrom by defaming Ms. Shapiro, discriminating and retaliating against Ms. Shapiro, aiding and abetting discrimination and retaliation against Ms. Shapiro, ordering Ms. Shapiro be terminated from her employment, invading the privacy of Ms. Shapiro, conducting sexually explicit searches of Ms. Shapiro's computers, intentionally committing harm to Ms. Shapiro, and engaging in a conspiracy to commit all of the tortious acts.

323.    Defendants engaged in concerted action with each other with the intention of systematically, intentionally, and maliciously interfering with Ms. Shapiro's employment relationship with MakeOffices.

324.    The intentional interference included creating a sham "for cause" termination to avoid paying Ms. Shapiro a previously agreed upon $200,000 severance payment.

325.    Defendants had prior knowledge of Ms. Shapiro's severance agreement.

326.    Defendants intentionally interfered with the severance agreement of Ms. Shapiro.

327.    Defendants tortiously interfered with the business expectancies of Ms. Shapiro's employment.

328.    Mr. Morrison and Mr. Spurlock are partners of the law firm Katten Muchin.

329.    Mr. Morrison and Mr. Spurlock are individually liable to Ms. Shapiro for their conduct.

330.    Katten Muchin is vicariously liable for the actions of its employees and partners.

331.    The conduct of Defendants was made with ill-will, was malicious, wanton and evinced a willful and conscious disregard for the rights of Ms. Shapiro, and further was accomplished in a reckless and grossly negligent manner.

332.    As a direct and proximate result of Defendants' actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant or having a young baby, fear of not being hired because of Defendants' defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and medical

expenses.  Ms. Shapiro has also experienced physical symptoms while thinking about or

discussing her former employer, including but not limited to severe panic attacks, nausea and

becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other

potential employers, friends and relatives have heard the highly offensive, false and defamatory

statements about her, and whether this will cause her to be unable to obtain and/or sustain

employment.  Defendants' conduct has irreparably harmed Ms. Shapiro's quality of life,

professionally and personally.

333.     Due to the character and severity of Defendants' willful, wanton, oppressive, and

deliberate conduct Ms. Shapiro is entitled to punitive damages.

## COUNT VIII
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
### (Against S. Scott Morrison, Katten Muchin,
### Daniel C. Spurlock, Ronald D. Paul, and Zach Wade)

334.     The foregoing allegations are incorporated as if re-alleged herein.

335.     As set forth above, Ms. Shapiro has been struggling with a medical situation

resulting in a double mastectomy (for which she took medical leave from MakeOffices), and was

suffering from hyperemesis gravidarum during her pregnancy in 2017, a condition that

complicates the pregnancy and is aggravated by stress.

336.     Defendants are aware that Ms. Shapiro has suffered and is suffering from these

significant medical challenges.

337.     With this knowledge and awareness, Defendants have purposefully targeted Ms.

Shapiro and terminated her because of her health, pregnancy and gender, misrepresented, misled

and made false and defamatory statements against Ms. Shapiro to attempt to cover up and justify

her termination while she was six months pregnant, to deprive her of her severance and maternity

leave, conduct sexually explicit and invasive searches of her private and professional

MakeOffices emails, have aided, abetted and intentionally discriminated and retaliated against Ms. Shapiro because of her health condition, pregnancy and gender, have attempted to force Ms. Shapiro to engage or otherwise participate in illegal and unethical conduct, have conspired against Ms. Shapiro to viciously attack Ms. Shapiro's emotional, financial and reputational stability, all with the intent to cause Ms. Shapiro severe emotional distress.

338.    Defendants' conduct was intentional and reckless in that it had the specific purpose of inflicting emotional distress on Ms. Shapiro, was fully intended, and Defendants knew or should have known, that severe emotion distress would likely result, or knew or should have known that severe emotional distress was substantially certain to result from their conduct.

339.    The actions and conduct of the Defendants, as set forth above, were intentional or reckless in that the Defendants had the specific purpose of inflicting emotional distress on Ms. Shapiro, fully intended their conduct, and knew or should have known that severe emotional distress would likely result.

340.    The Defendants' conduct toward Ms. Shapiro was outrageous and intolerable, offending generally accepted standards of decency and morality.

341.    This conduct by Defendants was actuated by malice, spite, and ill will; was willful and wanton; and evinced conscious disregards for the rights of Ms. Shapiro.

342.    The actions of Defendants have severely exacerbated the medical conditions suffered by Ms. Shapiro.

343.    Mr. Morrison and Mr. Spurlock are partners of the law firm Katten Muchin.

344.    Mr. Morrison and Mr. Spurlock are individually liable to Ms. Shapiro for their conduct.

345.    Katten Muchin is vicariously liable for the actions of its employees and partners.

346.    As a direct and proximate result of Defendants' actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant, fear of not being hired because of Defendants' defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and medical expenses.  Ms. Shapiro has also experienced physical symptoms while thinking about or discussing her former employer, including but not limited to severe panic attacks, nausea and becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other potential employers, friends and relatives have heard the highly offensive, false and defamatory statements about her, and whether this will cause her to be unable to obtain and/or sustain employment.  Defendants' conduct has irreparably harmed Ms. Shapiro's quality of life, professionally and personally.

347.    Due to the character and severity of Defendants' willful, wanton, oppressive, and deliberate conduct Ms. Shapiro is entitled to punitive damages.

### COUNT IX –
### DISCRIMINATORY TERMINATION OF EMPLOYMENT
### IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
### (Against MakeOffices, LLC)

348.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

349.    Ms. Shapiro is a former employee of MakeOffices within the meaning of D.C. Code § 2-1401.02(9).

350.    MakeOffices is an employer within the meaning of D.C. Code § 2-1401.02(10).

351.    Ms. Shapiro was wrongfully terminated from her position in violation of the D.C. Human Rights Act.

352.    Ms. Shapiro was wrongfully terminated in the District of Columbia.

353.    Ms. Shapiro is female, pregnant and has been dealing with a medical situation leading up to a double mastectomy (for which she required medical leave from MakeOffices). She also suffered from diagnosed hyperemesis gravidarum, which is aggravated by stress.

354.    Defendants are, and were, aware at all times material thereto, that Ms. Shapiro is female, pregnant, had the double mastectomy and was suffering from hyperemesis gravidarum.

355.    On June 19, 2017, MakeOffices, through its agents and officers, terminated Ms. Shapiro's employment fully aware of her pending pregnancy and expected due date within three months.

356.    Ms. Shapiro was targeted and wrongfully terminated because of her gender, her pregnancy and her health conditions.

357.    Because of the termination Ms. Shapiro will be deprived of maternity leave.

358.    Because of the false and defamatory termination "for cause," Ms. Shapiro will not be provided her Severance.

359.    Ms. Shapiro was wrongfully terminated in the District of Columbia.

360.    Ms. Shapiro's termination constitutes a violation of D.C. Code § 2-1402.11(a)(1).

361.    MakeOffices' conduct in so doing evinced ill will, recklessness, willful disregard of Ms. Shapiro's rights, wantonness, oppressiveness, maliciousness, and a spirit of mischief.

362.    As a direct and proximate result of Defendant's actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant, fear of not being hired because of Defendant's defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and medical expenses.  Ms. Shapiro has also experienced physical symptoms while thinking about or discussing her former employer, including but not limited to severe panic attacks, nausea and becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other potential employers, friends and relatives have heard the highly offensive, false and defamatory statements about her, and whether this will cause her to be unable to obtain and/or sustain employment.  Defendant's conduct has irreparably harmed Ms. Shapiro's quality of life, professionally and personally.

363.    As a result of the conduct by Defendant, Ms. Shapiro has incurred attorneys' fees and costs.

364.    Due to the severity of MakeOffices' conduct, Ms. Shapiro is entitled to punitive damages.

**COUNT X –**
**RETALIATION IN VIOLATION**
**OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**(Against MakeOffices, LLC)**

365.    The allegations of the foregoing paragraphs are incorporated as if re-alleged

herein.

366.    Ms. Shapiro is a former employee of MakeOffices within the meaning of D.C.

Code § 2-1401.02(9).

367.    MakeOffices is an employer within the meaning of D.C. Code § 2-1401.02(10).

368.    Ms. Shapiro was wrongfully terminated from her position in violation of the D.C.

Human Rights Act.

369.    Ms. Shapiro was wrongfully terminated in the District of Columbia.

370.    Pursuant to D.C. Code § 2-1401.01, Ms. Shapiro had the right to participate in

employment free of discrimination:

> Every individual shall have an equal opportunity to participate fully in the
> economic, cultural and intellectual life of the District and to have an equal
> opportunity to participate in all aspects of life, including, but not limited
> to, in employment, in places of public accommodation, resort or
> amusement, in educational institutions, in public service, and in housing
> and commercial space accommodations.

371.    Pursuant to D.C. Code § 2-1401.61, it is unlawful for any person to encourage,

coerce or request discriminatory action be taken:

> **Coercion or retaliation.**
>
> (a) It shall be an unlawful discriminatory practice to coerce, threaten,
> retaliate against, or interfere with any person in the exercise or enjoyment
> of, or on account of having exercised or enjoyed, or on account of having
> aided or encouraged any other person in the exercise or enjoyment of any
> right granted or protected under this chapter.

> (b) It shall be an unlawful discriminatory practice for any person to require, request, or suggest that a person retaliate against, interfere with, intimidate or discriminate against a person, because that person has opposed any practice made unlawful by this chapter, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing authorized under this chapter.
>
> (c) It shall be an unlawful discriminatory practice for any person to cause or coerce, or attempt to cause or coerce, directly or indirectly, any person to prevent any person from complying with the provisions of this chapter.

372.    Ms. Shapiro is female and was pregnant.  She also recently underwent a double mastectomy.

373.    Ms. Shapiro questioned and objected to being treated differently on the basis of her gender, health and pregnancy.  This constituted protected activity.

374.    Based on the conduct as alleged, MakeOffices interfered with Ms. Shapiro's right to enjoy her employment free of discrimination and retaliation.

375.    MakeOffices discriminated and retaliated against Ms. Shapiro in violation of her protected rights based on gender and disability in violation of the D.C. Human Rights Act.

376.    Based on the conduct as alleged, MakeOffices, coerced, threatened, and interfered with Ms. Shapiro's rights as protected under the D.C. Human Rights Act, and terminated her employment.

377.    Defendants further retaliated against Ms. Shapiro by filing a second lawsuit, the EDVA Action, and a Motion to Disqualify and for Sanctions against her in the Second Fairfax Action against Ms. Shapiro following her filing of her DCHRA claims in this litigation, the DC Action.

378.    Defendant's actions were willful, spiteful, filled with ill will, recklessness, intentional, and malicious, and evinced a conscious disregard for the rights of Ms. Shapiro.

379.    Based on the conduct as alleged, MakeOffices discriminated against Ms. Shapiro in violation of the rights granted to her under the D.C. Human Rights Act.

380.    Based on the conduct as alleged, MakeOffices discriminated and retaliated against Ms. Shapiro by coercing, threatening, and interfering with Ms. Shapiro's rights as granted to her under the D.C. Human Rights Act.

381.    The Defendant's discriminatory and retaliatory conduct was intentional, and it evinced ill will, recklessness, and willful disregard of Ms. Shapiro's rights, as well as wantonness, oppressiveness, maliciousness, and a spirit of mischief.

382.    The Defendant's discriminatory and retaliatory conduct had the effect and consequence of violating the D.C. Human Rights Act.

383.    As a direct and proximate result of Defendant's actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant, fear of not being hired because of Defendant's defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and medical expenses.  Ms. Shapiro has also experienced physical symptoms while thinking about or discussing her former employer, including but not limited to severe panic attacks, nausea and becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other

potential employers, friends and relatives have heard the highly offensive, false and defamatory statements about her, and whether this will cause her to be unable to obtain and/or sustain employment. Defendant's conduct has irreparably harmed Ms. Shapiro's quality of life, professionally and personally.

384.    Ms. Shapiro has also incurred attorneys' fees and costs as a result of Defendant's conduct.

385.    Due to the character and severity of Defendant's willful, wanton, oppressive, and deliberate conduct Ms. Shapiro is entitled to punitive damages.

### COUNT XI –
### BREACH OF CONTRACT – SEVERANCE AGREEMENT
### (Against MakeOffices, LLC)

386.    The allegations of the foregoing paragraphs are incorporated as if reallged herein.

387.    On July 18, 2016 MakeOffices offered Ms. Shapiro an Agreement providing for severance in the amount of $200,000 ("Severance Agreement").  More specifically, the Agreement reads:

> In the event that your employment with the Company is terminated without Cause before the first anniversary of the date set forth on the signature page to this letter, you shall be entitled to Two Hundred Thousand Dollars ($200,000) payable in twelve (12) equal monthly installments, subject to applicable taxes and withholdings…

388.    Ms. Shapiro accepted this offer by signature on July 18, 2016.

389.    Ms. Shapiro was terminated prior to the first anniversary of July 18, 2016.

390.    Ms. Shapiro was wrongfully discharged from her employment.

391.    Ms. Shapiro was not legitimately terminated for cause.

392.    The Agreement is valid and enforceable.

393.    Ms. Shapiro has not violated the terms of the Severance Agreement.

394.     MakeOffices has materially breached this agreement by terminating Ms. Shapiro not legitimately for cause, and refusing payment of the agreed upon severance amount.

395.     Section e of the agreement provides for attorneys fees incurred for enforcement and recovery of damages.  Specifically, "In the event of default or breach of this Agreement by Company, Employee shall be entitled to enforce the Agreement and recover damages from Company including, but not limited to, reasonable attorney's fees."

396.     As a result of the breach, Ms. Shapiro has suffered the loss of the $200,000 severance, plus interest.

397.     Pursuant to Section e of the Severance Agreement Ms. Shapiro seeks reimbursement for attorneys' fees and costs incurred in connection with collection of her severance amount pursuant to the breach by MakeOffices.

### COUNT XII –
### RETALIATORY TERMINATION OF EMPLOYMENT
### IN VIOLATION OF PUBLIC POLICY
### (Against MakeOffices, LLC)

398.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

399.     As set forth above, MakeOffices, controlled by minority shareholders directed by Mr. Paul and Mr. Wade, demanded that Ms. Shapiro sign an agreement prepared by Katten Muchin, Mr. Morrison and Mr. Spurlock that would have caused Ms. Shapiro to violate the law, as well as participate in, condone and engage in unethical conduct.

400.     Ms. Shapiro refused to sign the agreement because it would breach her fiduciary duties to MakeOffices and the majority shareholder, as well as cause her to condone, participate in and engage in unethical conduct.

401.    Ms. Shapiro is a lawyer and is governed by the Rules of Professional Responsibility and the applicable Ethics Rules.

402.    The demands for Ms. Shapiro to sign the agreement were demands to engage in illegal conduct.

403.    As a result of her refusal to sign the illegal and unethical agreement, MakeOffices terminated her employment.

404.    The termination is wrongful retaliation.

405.    Ms. Shapiro was wrongfully terminated in the District of Columbia.

406.    MakeOffices' conduct in so doing evinced ill will, recklessness, willful disregard of Ms. Shapiro's rights, wantonness, oppressiveness, maliciousness, and a spirit of mischief.

407.    As a direct and proximate result of Defendant's actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant, fear of not being hired because of Defendant's defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, and medical expenses.  Ms. Shapiro has also experienced physical symptoms while thinking about or discussing her former employer, including but not limited to severe panic attacks, nausea and becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other

potential employers, friends and relatives have heard the highly offensive, false and defamatory statements about her, and whether this will cause her to be unable to obtain and/or sustain employment.  Defendant's conduct has irreparably harmed Ms. Shapiro's quality of life, professionally and personally.

408.    Due to the severity of MakeOffices' conduct, Ms. Shapiro is entitled to punitive damages.

**COUNT XIII**
**CIVIL CONSPIRACY**
**(against Katten Muchin, S. Scott Morrison,**
**Daniel C. Spurlock, Ronald D. Paul, and Zach Wade)**

409.    The foregoing allegations are incorporated as if re-alleged herein.

410.    Katten Muchin, Mr. Morrison, Mr. Spurlock, Mr. Paul, and Mr. Wade are referred to collectively as "Conspiracy Defendants."

411.    The Conspiracy Defendants willfully entered into an agreement to tortiously interfere with Ms. Shapiro's at-will employment with MakeOffices ("Employment Conspiracy").

412.    The Conspiracy Defendants willfully entered into an agreement to tortiously interfere with Ms. Shapiro's Severance Agreement with MakeOffices ("Severance Conspiracy").

413.    The Conspiracy Defendants willfully entered into an agreement to invade the privacy of Ms. Shapiro ("Invasion of Privacy Conspiracy").

414.    The Conspiracy Defendants willfully entered into an agreement to violate the Computer Fraud and Abuse Act ("CFAA Conspiracy").

415.    The Conspiracy Defendants willfully entered into an agreement to intentionally inflict emotional distress upon Ms. Shapiro ("Intentional Infliction Conspiracy").

416.    The Employment Conspiracy, Severance Conspiracy, Invasion of Privacy Conspiracy, CFAA Conspiracy, and Intentional Infliction Conspiracy (Collectively "Conspiracies") were formed out of malice, ill will and spite.

417.    As a direct and proximate result of the Conspiracies, Ms. Shapiro was wrongfully terminated on June 19, 2017.

418.    As a direct and proximate result of the Severance Conspiracy, MakeOffices breached its Severance Agreement contractual obligations to Ms. Shapiro.

419.    The Conspiracy Defendants employed improper means in furtherance of their Conspiracies.

420.    The Conspiracy Defendants unlawfully accessed Ms. Shapiro's emails in furtherance of the Conspiracies.

421.    The "improper means" employed by the Conspiracy Defendants included all of the conduct set forth in detail in this Complaint, including, but not limited to defamation, discrimination and retaliation in violation of the D.C. Human Rights Act, invasion of privacy, intentional infliction of emotional distress and computer trespass.

422.    The Conspiracy Defendants' actions were willful, spiteful, filled with ill will, intentional, and malicious, and evinced a conscious disregard for the rights of Ms. Shapiro.

423.    Katten Muchin, Mr. Morrison, Mr. Spurlock and Mr. Paul intentionally furthered the Conspiracies by directing MakeOffices and Zach Wade to wrongfully terminate Ms. Shapiro in violation of the DC Human Rights Act.

424.    The direction by Mr. Morrison, Mr. Spurlock, and Katten Muchin to wrongfully terminate Ms. Shapiro was executed in part to profit off of fees generated by representing their clients against Ms. Shapiro.

425.    This collusion is evidenced by Katten Muchin, Mr. Morrison, and Mr. Spurlock drafting the June 19, 2017 termination letter and attachment.

426.    The termination letter even references Ms. Shapiro as a "Defendant" and Mr. Morrison's clients as "Plaintiffs."

427.    The numerous connections to Katten Muchin, Mr. Morrison, and Mr. Spurlock in the termination letter and attachments evidence a conspiracy between the Conspiracy Defendants.

428.    Ms. Shapiro was retained as General Counsel and Chief of Staff of MakeOffices when Mr. Wade became CEO of the company April 10, 2017 and performed in an exemplary manner and without any performance issue until her wrongful termination in June 19, 2017.

429.    Mr. Morrison and Mr. Spurlock are partners of the law firm Katten Muchin.

430.    Mr. Morrison and Mr. Spurlock are individually liable to Ms. Shapiro for their conduct.

431.    Katten Muchin is vicariously liable for the actions of its employees and partners.

432.    As a direct and proximate result of Defendants' actions, Ms. Shapiro has suffered and continues to suffer severe emotional distress, with physical manifestations, including, but not limited to, heightened anxiety, development of a stress related sleep disturbance, fear of not being able to find a job due to being pregnant, fear of not being hired because of Defendants' defamatory conduct, fear and concern for her future ability to earn a living and provide for her child, diminished self-confidence and self-worth, feelings of helpless and hopelessness, insomnia, nightmares, withdrawal from friends and family, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, exacerbation of her diagnosed hyperemesis gravidarum and general anxiety disorder, past and future loss of income and

benefits of employment, lost career and business opportunities and advancement, and medical expenses. Ms. Shapiro has also experienced physical symptoms while thinking about or discussing her former employer, including but not limited to severe panic attacks, nausea and becoming physically ill. Ms. Shapiro is constantly wondering and worrying about whether other potential employers, friends and relatives have heard the highly offensive, false and defamatory statements about her, and whether this will cause her to be unable to obtain and/or sustain employment. Defendants' conduct has irreparably harmed Ms. Shapiro's quality of life, professionally and personally.

433.    As a direct and proximate result of these actions, Mr. Shapiro has been irreparably harmed, will continue to be irreparably injured, and is threatened with irreparable injury, and has suffered special damages, including actual past, current and future financial losses, loss of good will, loss of her severance pay, loss of agreed payment of attorneys fees, and other pecuniary and non-pecuniary damages.

434.    Due to the character and severity of Defendants' willful, wanton, oppressive, and deliberate conduct Ms. Shapiro is entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff JAIMIE SHAPIRO requests that this Court enter Judgment in her favor, and against the Defendants, jointly and severally, on the above Counts as applicable to each, and further:

(a)    Award Ms. Shapiro compensatory damages on each of the above-stated Counts as determined by the jury, in an amount no greater than $50 million; and in addition

71

(b)    Award Ms. Shapiro punitive and exemplary damages of on Counts I, II, III, IV, VI, VII, VIII, IX, X, XII and XIII, in the amount determined by the jury, in an amount no greater than $150 million; and in addition,

(c)    Award Ms. Shapiro appropriate front pay and back pay, including all lost income and benefits of employment both past and future; and in addition,

(d)    Award Ms. Shapiro reasonable attorneys' fees and the costs of this action on Counts I, II, III, IV, V, IX, X and XI  under D.C. Code § 2-1403.13(a)(1)(E) as provided in D.C. Code § 2-1403.16(b); and pursuant to 18 U.S. C. § 1030(g) as defined in U.S. C. § 1030(e)(11); and pursuant to section (e) of the Severance Agreement; and in addition,

(e)    Declare that the Defendants have violated the District of Columbia Human Rights Act; and in addition,

(f)    Enjoin the Defendants from further violations of the District of Columbia Human Rights Act; and in addition,

(g)    Enjoin the Defendants from further harassment and contact with Ms. Shapiro; and in addition,

(h)    Revoke all permits, licenses, franchises, benefits, exemptions or advantages issued by or on behalf of the government of the District of Columbia to Defendants, pursuant to D.C. Code § 2-1402.67; and in addition,

(i)    Award Ms. Shapiro such other and further relief as may be appropriate under the circumstances.

## JURY DEMAND

**PLAINTIFF JAIMIE SHAPIRO DEMANDS A TRIAL BY JURY.**

*/S/ ELAINE CHARLSON BREDEHOFT*
_____
Elaine Charlson Bredehoft,
D.C. Bar. No. 441425
Carla D. Brown
D.C. Bar No. 474097
Daphne Shih Gebauer
D.C. Bar No. 982568
CHARLSON BREDEHOFT
 COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
*Counsel for Plaintiff, Jaimie Shapiro*

## CERTIFICATE OF SERVICE

I hereby certify on the 6th day of November 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing to the following:

> Stephen W. Robinson, Esq.
> David L. Greenspan, Esq.
> Nicholas D. SanFilippo, Esq.
> McGuire Woods LLP
> 1750 Tysons Blvd., Suite 1800
> Tysons, VA  22102
> Telephone: (703) 712-5000
> Facsimile: (703) 712-5050
> srobinson@mcguirewoods.com
> dgreenspan@mcguirewoods.com
> nsanfilippo@mcguirewoods.com
> *Counsel for Defendants Katten Muchin Rosenman LLP,*
> *S. Scott Morrison, Esq., Daniel C. Spurlock, Esq.,*
> *Ronald D. Paul, Zach Wade, and MakeOffices LLC*


> */S/ ELAINE CHARLSON BREDEHOFT*
> _____
> Elaine Charlson Bredehoft, D.C. Bar No. 441425
> Carla D. Brown, D.C. Bar No. 474097
> Daphne Shih Gebauer, D.C. Bar No. 982568
> CHARLSON BREDEHOFT COHEN & BROWN, P.C.
> 11260 Roger Bacon Drive, Suite 201
> Reston, Virginia 20190
> (703) 318-6800 Telephone
> (703) 318-6808 Facsimile
> ebredehoft@cbcblaw.com
> cbrown@cbcblaw.com
> dgebauer@cbcblaw.com
> *Counsel for Plaintiff, Jaimie Shapiro*